[Civ. No. 27575.   Second Dist., Div. Three.   Aug. 2, 1965.]

SAN BERNARDINO VALLEY WATER DEVELOPMENT COMPANY, Plaintiff and Appellant, v. SAN BERNARDINO VALLEY MUNICIPAL WATER DISTRICT, Defendant and Respondent.

Kaplan, Livingston, Goodwin & Berkowitz, Bayard F. Berman, Sol Rosenthal and Morris E. Cohn for Plaintiff and Appellant.

Alexander R. Tobin, Robert J. Webb, Martin McDonough and McDonough, Holland, Schwartz, Allen & Wahrhaftig for Defendant and Respondent.

ASHBURN, J.*—Plaintiff San Bernardino Valley Water Development Company[1] is assignee of Stephan Riess, who on July 1, 1959, made a written contract with defendant San Bernardino Valley Municipal Water District[2] to locate and drill for it wells producing "potable water suitable for human consumption, from sources in hard-rock water-bearing channels and other sources from which water is not now ob-

---

*Retired Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]Hereinafter called "Development Company" or "Water Company."

[2]Hereinafter called "District" or "Water District." Defendant is a municipal water district organized under the Municipal Water District Act of 1911 of the State of California.

tained or utilized.'' The drilling of the wells was to be done solely at the expense of the Development Company. It did partially complete two wells known as Blu-Cut Nos. 1 and 2, also completed a well designated as Yucaipa No. 1, expending reasonably in the drilling of said wells the sum of $187,-292.94 out-of-pocket expenses, as the court affirmatively found. When the Yucaipa well was offered to the District as completed and for the purpose of flow testing by defendant, it delayed action and finally refused to accept the well or pay for it. So plaintiff sued, the District defended upon the ground, among others, that the water was not from a source specified in the contract, not ''new'' water. The trial court rendered judgment for defendant but, while denying plaintiff any compensation for work done by it, permanently enjoined the District from ''drilling, developing, pumping or otherwise exploiting or using any of the wells drilled or partially drilled by plaintiff at Yucaipa and/or Blu-Cut.''

We have concluded that the judgment must be reversed because of refusal of the court to make certain findings requested by plaintiff. Unfortunately this requires a somewhat elaborate exposition of the matter.

Succinctly stated the gist of our reasoning is that paragraph 9(e) of the contract requires Riess to satisfy the District that the water produced by him is not derived from the Santa Ana River watershed and that proof of that fact ''may be furnished by determination of the static head of the newly discovered water source or by H-3 isotope test or by chemical analysis.'' The well designated as Yucaipa No. 1 having been completed, plaintiff undertook to furnish proofs required by the language just quoted. This is the type of satisfaction contract under which performance is tested by the question whether a reasonable man would be satisfied with the same; any dissatisfaction must be real and must be made known to the promisor promptly and the grounds stated so that curable defects in the performance may be remedied. In this instance the District pursued delaying tactics, asserting erroneously and arbitrarily that plaintiff had not given it any written notice of completion of the well as required by the contract and had denied access thereto for the purpose of making a flow test under the terms of the contract. Plaintiff having sued and relied upon performance of paragraph 9(e), defendant injected the issue of whether as a matter of scientific fact the water of the well drilled by plaintiff had its

source outside the Santa Ana River watershed regardless of what plaintiff's proofs under section 9(e) might show; the parties joined in canvassing this issue *in extenso,* but plaintiff did not waive its issue of compliance with the terms of paragraph 9(e). The court decided the case upon the issue of what was the source of the well's water as a question of scientific fact and refused to make findings upon the meaning and effect of paragraph 9(e) and the sufficiency of plaintiff's compliance with it, which findings were specially requested pursuant to sections 632 and 634, Code of Civil Procedure. These refusals amounted to a denial of a trial upon the controlling issue of the case and hence worked prejudicial error.

At and prior to the time of making the subject contract, the District and its inhabitants were sorely in need of additional water for domestic and agricultural uses, especially in the Yucaipa area. The District was restricted by the ruling in *Orange County Water Dist.* v. *City of Riverside,* 173 Cal. App.2d 137 [343 P.2d 450] with respect to the amount it could take from the basins of the Santa Ana River watershed, and was diligently seeking an additional supply. Hearing of Mr. Riess and his successes in drilling and producing water from deep wells where others were unable to find it, the District, through Mr. Hugo W. Wilde, its general manager, wrote Mr. Riess expressing "vital" interest in his manner of developing "prime water" and in obtaining a proposition from him [Ex.DD]. This led to meetings and discussions which resulted in the July 1, 1959, contract, copy of which is attached to the amended complaint as Exhibit A.

Counsel for respondent argue that this contract was prepared by plaintiff's attorneys and hence any ambiguities are to be resolved against plaintiff. But the record shows the contrary for the contract, especially its paragraph 9(e) (concerning method of proof that any well brought in by Mr. Riess measured up to the contract standard) was the subject of numerous conferences and drafts. Mr. Wilde testified that "there must have been probably 25 sets of contracts before an agreement was made"; "Yes, there was long, many hours of discussion on that subject" [the problem of establishing that the water produced by Riess would not be derived from the Santa Ana River watershed]; "I imagine they did [lead to paragraph 9(e)] because we rewrote and rewrote and tried to come up with something that would describe the pur-

pose." "THE COURT: The question is what conversation, if any, did you have on the subject of Paragraph 9(e) of the contract. THE WITNESS: Oh, we had many of them. That was rewritten many times." "[T]his thing became months and months of a hassle."

Mr. Riess' theory concerning production of "new" water was explained repeatedly to Mr. Wilde and his board of directors. It is summarized in appellant's opening brief (p. 4) as follows: "that there were long neglected sources of water to be found by drilling at carefully selected sites at high altitudes in hard rock formations and thereby intercepting deep-seated under-ground fissures or openings running along fault lines, i.e., fractures in the earth's crust." Plaintiff's expert witness, Dr. George C. Kennedy, Professor of Research at University of California at Los Angeles, expressed the opinion that Riess' theory "that migratory waters can be intercepted by drilling along fault planes" is obviously correct. He also said: "I think it is enormously clever of Mr. Riess to have figured out that that is a good place, but he found it out the hard way. He has used rather amazing skill. He is an excellent field geologist. He is certainly not a theoretical field geologist. . . ." Also: "I examined three of his sites and all of them were located in a similar kind of geologic framework, either on a fault or at the intersection of fault systems." He further remarked: "I particularly enjoyed Mr. Angelillo's very astute definition of geology, which he says is the codification of opinion. I am sorry to say that geology is an extremely inexact science."

Mr. Wilde believed in Riess and his theory and everybody else knew it was a theory, as witness letter of Mr. Gould (plaintiff's vice-president) to Wilde of June 17, 1959 (prior to execution of contract), explaining omission of the words "primary or juvenile water" from the draft of the contract and saying: "The reason for this is that we feel that the validity of the contract should not be made dependent on any representation by Mr. Riess as to *a scientific theory the truth of which may not be proved for many years.*" [Italics added.]

Wilde recommended the contract to the board in the face of imminence of litigation with watershed property owners and the further fact that "everybody accused us of being crackpots for making such a deal, not the press, but everybody in general. We had a great deal of adverse publicity from newspapers and everything else that accused the Dis-

trict of being associated with a crackpot deal, . . . Q. And among the people that accused the District of being a crackpot for entering into this contract with Riess with [sic] the local San Bernardino Press? A. I think possibly they were. Most everything else in the area was giving us a pretty rough time. Q. Including your constituents? A. That's right. . . . Q. Well, do you recall saying to Mr. Mendelsohn in words or in substance in reference to Mr. Riess that, he, Riess, 'knows what he is talking about, and it's obvious that he's got a big fight on his hands because the water boys in the State don't like it'? . . . [A.] I think that's generally probably true."

The contract, after reciting Riess' experience in locating and developing wells of potable water "from sources in hard-rock water-bearing channels and other sources from which water is not now obtained or utilized" and the District's desire for "new sources of water," consents in paragraph 1 to assignment of the agreement to a corporation upon condition that it assume the obligations thereof and provide the benefit of Riess' services.[3] The assignment to plaintiff corporation was made and was approved by defendant.

Paragraph 2 provides that the wells be located within a specified area of some 3,500 square miles, a large part of which lies on the northerly side of the mountains and wholly outside the Santa Ana River watershed. Riess was to select drilling sites subject to reasonable approval by the District, the first well to be in Yucaipa Valley (which is geographically located within the watershed), but difficulty and delay in acquiring such site led to mutual agreement that the first well or wells be at Blu-Cut. The contract was to run for five years from commencement of drilling and to cover a series of wells; the District to accept and pay for a total of up to 7,000 inches of water, an inch being defined as the equivalent of 9 gallons per minute. At the prescribed rate of $1,000 per inch (paragraph 10), this made a potential liability of $7,000,000. The District was obligated to acquire at its own cost well sites and rights of way for pipelines, flumes, etc.

---

[3]This was due to the necessity of financing Riess' drilling program; that was done by a sale of shares in the East by or through Mr. Nathan K. Mendelsohn whereby $101,000 was raised, which sum was supplemented by loans aggregating $82,000 made by Mendelsohn's wholly-owned corporation, California City Development Company. Mr. Mendelsohn became chairman of the board of plaintiff corporation, its business manager, and its negotiator of the contract with the District.

Paragraph 6 provides that Riess shall drill promptly and pay all costs and expenses incurred "in the construction of said well" but he was not required to pay the cost of pump testing. The District is required upon completion of any well to file notice of acceptance or completion and to pay Riess any sums due after lien and stop-notice rights of laborers and materialmen expire.

Paragraph 7 provides that the only expenditure by the District, except as stated in paragraphs 2, 5, 8 and 10(b)— i.e., acquisition of drilling sites, rights of way, costs of production flow test under paragraph 8, and payment of $1,000 per inch of water produced in conformity with contract— shall be the purchase of one or more wells as completed and accepted by the District.

Paragraph 8 contains the following: "Riess shall give written notice to the District when any well is completed under this Agreement. Thereafter the District at its own expense shall promptly furnish necessary pumping equipment and conduct production flow tests up to a maximum of thirty (30) days in the discretion of the District." The balance of the paragraph provides for mutual approval of a pump-testing company, Riess' approval of equipment and procedures of the pumping test, and any necessary cementing work at ground level to be at the expense of the District.

Paragraph 9 requires that the well be located in the area described in the agreement, that the water comply with minimum standards for human consumption, that the pumping lift be less than 600 feet, and the yield be at least 300 gallons of water per minute unless the District should elect to accept a well with lower output.

Paragraph 10 provides that any well which meets contract requirements shall be accepted by the District within 30 days from completion of pumping tests thereon, payment to be at the rate of $1,000 per inch of water produced from each well. It also says that one-third of the price payable for the well shall be paid "upon completion of the flow test establishing the rate of flow of the well," the balance to be payable in annual instalments and the price to be adjusted upward or downward as the production of the well might change from time to time.

Paragraph 14 obviously was intended to preclude parol evidence of the terms or meaning of the document. It says:

"This Agreement contains the full and complete understanding between the parties with reference to the within subject matter, supersedes all prior Agreements and understandings whether written or oral pertaining thereto, and cannot be modified except by a written instrument signed by all of the Parties hereto."

Sub-paragraph 9(e) controls this case. It says: "It must be established to the satisfaction of the District that the water produced is not derived from the Santa Ana River watershed, that the water constitutes a new source of water for the area served by the District and does not constitute a substitute extraction site for water. Proof of this may be furnished by determination of the static head of the newly discovered water source *or* by H-3 isotope test *or* by chemical analysis. The cost of making the determination in this subparagraph shall be paid by the District." (Italics added.)

It will be noted that these proofs are specified in the disjunctive—determination of static head *or* H-3 isotope test *or* chemical analysis—and that the cost thereof shall be paid by the District. ▮ The law specifies that alternative or disjunctive promises of a contract afford an option to the promisor to select one or more which he will perform (Civ. Code, § 1448; 12 Cal.Jur.2d § 209, p. 427; 17 Am.Jur.2d § 363, p. 805). ▮ That this was the understanding and expectation is evidenced by Mr. Wilde's letter of April 2, 1959, to Mr. Mendelsohn in which he refers to waters having no riparian rights attached to them and says "they are to be distinguished in their much higher static level, so that beyond a doubt it can be established that a natural barrier exists between these waters and others that are already claimed or appropriated. In addition to that, the chemistry of the waters will distinguish these waters from the waters found in the normal aquiferous [aquifers] in catchment areas." Wilde, under examination pursuant to section 2055, Code of Civil Procedure, said that at the time of signing the contract he might have said to Mendelsohn, "Nat, if any of these tests show the water from the Riess well to be different from the Santa Ana River watershed, then we are satisfied," and "I may have said that as an individual, but I was not contracting on the statement. I may have said that over the phone; I don't. I would probably say that today." Mendelsohn testified that he [Mendelsohn] said, "How is this going to be proved? How are your directors going to be satisfied

that the water Riess gets is contract water? And he [Wilde] said, 'Nat, look, Steve and I understand this. We understand each other completely, and we know when water through its static or through its chemistry is clearly differentiated from the surrounding basin waters.' "

S. A. Camp Pump Company made a well test report on the Yucaipa well showing January 23, 1960, as date of completion of well development, and production of 500 gallons per minute at a depth of 553 feet; also, "Air or gas in well. Can not pull water level below 600'." When the air or gas became manifest the pump was unable to handle the job and by mutual agreement the firm of Layne and Bowler was substituted as pumper and further efforts were made to control the flow and ascertain the production, but that was also unsuccessful.

Mr. Raymond D. Roberts, who was in charge of this later operation and a defense witness, testified in part: "We had a terrific reservoir that we had to deplete, and we would have had to have had a larger engine than we had to pump the well dry in 30 minutes. Q. You spoke of reservoir. Are you speaking of the well column within the casing of water as a reservoir? . . . A. Well, the hole was drilled larger than the casing, that would be a portion of a reservoir, but actually out into the aquifer itself." It was agreed between plaintiff and defendant that a new and better designed pump would be necessary for the job, but nothing seems to have been done along that line.

Part of the Layne and Bowler effort comprised a 24-hour flow test made at the instance and expense of the District, but the result was unsatisfactory and the amount of production was not determined definitely. The contract, as above indicated, provides in paragraph 6 that "Riess shall not be required to pay the cost of pump testing." Also, in paragraph 8, ". . . the District at its own expense shall promptly furnish necessary pumping equipment and conduct production flow tests up to a maximum of thirty (30) days in the discretion of the District."

On April 18, 1960, Mr. Riess wrote to Mr. Wilde and his board of directors a letter, extracts from which are set forth in the margin.[4] Certain suggestions were made concerning

[4] "Enclosed is a report on the drilling and pumping of Yucaipa well No. 1 and on drilling of Blu-Cut wells Nos. 1 and 2."

"It will appear from the report as to Yucaipa No. 1 that it is a

installation of an engine capable of pumping 50 inches of water from a level of 600 feet and concerning other matters, including a request for a conference for the purpose of clarifying their respective obligations "as to developing and testing during the pumping period set forth in the Agreement."

Nothing seems to have come from this, and the reason may not be far to seek. Criticism and ridicule of Wilde and the board members had not abated, and the production of the well gave rise to numerous threats of suits on behalf of property owners who had rights to water from the basins of the Santa Ana River watershed. Also, a contract for Feather River water had been made by the District since execution of the Riess contract and during the progress of the drilling. The post-drilling action of the board and Mr. Wilde is significant.

The District having made no written response to the letter of April 18, 1960, Mr. Mendelsohn, whose money and that of his investor-associates was at stake, talked with Wilde about the matter. According to Mendelsohn, he [Mendelsohn] said, "Well, what else is wrong with the thing? He [Wilde] said, 'Well, for some reason or other they don't consider this a proper kind of demand. The lawyers are technical, and they want a demand letter.' And I simply blew my top. I remember screaming at Mr. Wilde, I was so furious, because the sense of this letter followed the telephone conversation I had with Mr. Wilde. I screamed at him and I said, 'Well, then, what the hell is a demand letter?' . . . and, finally, he said, 'Well, Nat, don't get mad. I just have to listen to what these lawyers say.' And I said, 'Well, forget it. Tell me what a demand letter is and I'll take it down,' and he dictated

---

good well delivering high-quality water which over an extended period has produced no less than 300 gallons per minute and for extended periods has produced consistently more. Furthermore the fact that two separate pump test installations were unable to pump the well off gives further evidence that this well may develop into a large producer." . . .

"As a result, we know that we have a well capable of producing not less than 300 gallons per minute, the minimum specified in the above-mentioned contract. Moreover, on the basis of presently available information, we are convinced that the actual long-term capacity of the well is substantially above this figure. Yet no one is in a position today to state a precise figure representing the capacity of the well for the purpose of turnover, acceptance and payment by the District. On the other hand, we are advised that the water from this well is urgently needed in the area, and that it is in the best interests of all concerned that a second well be started as soon as possible at Yucaipa."

almost word for word that letter." "Q. Now, you are referring to Plaintiff's Exhibit 7, the letter of April 27, 1960? A. Yes, I am." Wilde himself testified: "I imagine that I probably did" tell him he "did not regard that letter of April 18 as complying with the contractual requirement of notice" and "I think he asked me how he would do it, and I said I would do something like this, or words to that effect, yes." "I probably went into quite a few details, yes. What I thought should be in that letter."

So a letter of April 27, 1960 (Ex. 7), was delivered to defendant; addressed to the board of directors, it reads as follows: "In accordance with our contract, we hereby offer for your immediate acceptance the subject well known as Yucaipa #1.   [¶] Based on our analysis to date, we rate this well at a minimum of 540 gallons per minute or 60 inches. In accordance with this rating, please consider this letter as our demand on you for payment to us of $60,000.00 payable in the manner set forth in our contract.   [¶] It is understood, in accordance with our contract, that the price of this well will be adjusted up or down based on experience. [¶] We attach herewith proofs, as per contract, that the water from Yucaipa #1 'is not derived from the Santa Ana River watershed', namely: 1. Affidavit of Stephan Riess and James G. Scott as to the static head of Yucaipa #1. 2. Photostatic copy of a chemical analysis report made by Hilton Agricultural Laboratory." The text of its enclosures is set forth in the margin.[5] Those proofs include affidavit of Mr. Riess and Mr. Scott and the chemical analysis mentioned

[5]Affidavit dated April 27, 1960: "The undersigned, Stephan Riess and James G. Scott, being first duly sworn, hereby certify as follows: 1. The well Yucaipa #1, located on the Elizabeth Ranch in San Bernardino County, California, has been drilled to a depth of 831 feet at an elevation of approximately 3,000 feet.   2. The static head of the well is 40 feet fluctuating within a range of three to four feet by observation."

Letter from Hilton Agricultural Laboratory to Riess dated April 20, 1960: "Reporting Lab. No. 1124, a water sample submitted April 18, 1960 marked 'Yucaipa U-1 Well—sampled April 10, 1960.   Data are attached.   [¶] Analyses are reported as Milligram Equivalents per Liter (m.e.) as Parts per Million ·(ppm) and as Pounds per Acre Foot (lbs. A/Ft) unless otherwise noted.   [¶] The analysis indicates a water of excellent quality.   Total solids are low as well as total hardness. These features are especially favorable for domestic use.   [¶] The laboratory would rate the water as an 'Excellent, Class 1' water, very acceptable for domestic purposes as well as for other common uses such as irrigation.   It is believed that nearly all accepted classification systems would rate the water highly."

Hilton Agricultural Laboratory Report dated April 20, 1960, Lab. No.

in the letter. The former says the well has been drilled to a depth of 831 feet and the static head is 40 feet fluctuating within a range of 3 to 4 feet. The report of the Hilton Agricultural Laboratory upon a chemical test made by it says in part that the water is of excellent quality, low in solids and hardness, and is rated by Hilton as "Excellent, Class 1" water. The data attached to the Hilton report show *inter alia* that there was no nitrate in the water.

At this point the District adopted and pursued a Fabian policy. Notwithstanding the first sentence of the letter of April 27—"In accordance with our contract, we hereby offer for your immediate acceptance the subject well known as Yucaipa I"—the District took the position that plaintiff had given it no written notice of completion of the well as required by paragraph 8 of the contract and had not given it possession for purpose of a flow test, and hence no action on its part was required. To this position defendant and its officers adhered until the exigencies of the trial dictated otherwise. The court found (XIX): "That plaintiff did not preclude defendant from reasonable access to the Yucaipa well." In effect, it also found (XVIII) that notice of completion had been given: "That defendant did not owe any duty to plaintiff to pump test the Yucaipa well, employ ex-

1124: "Report to: Mr. Stephan Riess   Material: Well Water   Designated: 'Yucaipa U-1' Submitted: April 18, 1960

|  | Milligram Equivilents Per Liter | Parts Per Million | Pounds Per Acre Foot |
|---|---|---|---|
| Calcium (Ca) | 1.37 | 17 | 46 |
| Magnesium (Mg) | 2.11 | 42 | 114 |
| Potassium (K) | —— | — | — |
| Sodium (Na) | 1.31 | 30 | 82 |
| Carbonate (CO₃) | Nil | — | — |
| Bicarbonate (HCO₃) | 2.52 | 154 | 418 |
| Chloride (CL) | .48 | 17 · | 46 |
| Sulfate (SO₄) | 1.39 | 67 | 182 |
| Nitrate (NO₃) | Nil | — | — |
| TOTAL DISSOLVED SOLIDS | | 327 | 888 |

| Cation Ratios | | Anion Rations | | Hardness (Grains per Gallon) | |
|---|---|---|---|---|---|
| % Calcium | 28.6 | % Carbonate | —— | | |
| % Magnesium | 44.0 | % Bicarbonate | 57.4 | Calcium Carbonite | 4.0 |
| % Sodium | 27.4 | % Chloride | 10.8 | Magnesium Carbonate | 6.2 |
| % Potassium | —— | % Sulfate | 31.8 | Total Hardness | 10.2 |
| | | % Nitrate | —— | Temporary Hardness | 7.4 |
| | | | | Permanent Hardness | 2.8" |

perts or perform any other tests under paragraph 9 of the contract, under the facts and circumstances prevailing at or about *the time plaintiff gave notice of completion of the well and made demand on defendant for payment.*" [Italics added.]

Although defendant's representatives gave the impression of harboring an intention not to accept or pay for the well, they did not voice to plaintiff as a fact the basis or grounds for dissatisfaction, a thing which the law required them to do. Paragraph 9(e) of the contract required plaintiff to establish to the satisfaction of the District that the water produced is not derived from the Santa Ana River watershed, etc., and it immediately specified the methods by which (one or more of them) proof that the water of the well was "new" water should be made. Plaintiff had elected to proceed upon two of the three specified methods, i.e., showing of static head of the well and chemical analysis of its water.

This is the type of satisfaction contract to which the objective test of satisfaction is applicable, namely, what performance would satisfy a reasonable promisee in the premises. Any rejection on the ground of dissatisfaction must be made promptly and in good faith. Restatement of the Law of Contracts, section 265, page 380, Comment a: "A promise conditional upon the promisor's satisfaction is not illusory since it means more than that validity of the performance is to depend on the arbitrary choice of the promisor. His expression of dissatisfaction is not conclusive. That may show only that he has become dissatisfied with the contract; he must be dissatisfied with the performance, as a performance of the contract, and his dissatisfaction must be genuine."

*Collins* v. *Vickter Manor, Inc.,* 47 Cal.2d 875, 882 [306 P.2d 783] : "A contractual provision for performance to the satisfaction of one of the parties ordinarily calls for such performance as would be satisfactory to a reasonable person. [Citation.] If acceptance or rejection of the soil compaction report and maps were dependent on the buyer's uncontrolled caprice, then he would be the sole judge of his own satisfaction and could withdraw from the contract without regard to the reasonableness of his decision. [Citation.] But where the question is whether an agreed performance will satisfy a requirement of commercial value or quality, operative fitness or mechanical ability, the party to whom such performance is tendered is not justified in claiming arbitrarily, unreason-

ably, or capriciously that he is not satisfied, in order to evade liability. [Citations.]''

*Mattei* v. *Hopper*, 51 Cal.2d 119, 123 [330 P.2d 625]: ''First, in those contracts where the condition calls for satisfaction as to commercial value or quality, operative fitness, or mechanical utility, dissatisfaction cannot be claimed arbitrarily, unreasonably, or capriciously [citation], and the standard of a reasonable person is used in determining whether satisfaction has been received. [Citations.]''

See also *Rodriguez* v. *Barnett*, 52 Cal.2d 154, 160-161 [338 P.2d 907]; *Leboire* v. *Royce*, 53 Cal.2d 659, 671-673 [2 Cal. Rptr. 745, 349 P.2d 513]; 5 Williston on Contracts (3d ed.) section 675B, page 210; 13 American Jurisprudence, Second Edition, section 30, page 32; 44 American Law Reports, Second Edition, 1114-1119. Construction contracts, such as well drilling, fall in this category. (90 A.L.R.2d Ann. at p. 1359; 17A C.J.S. § 495(2), p. 723; *Scott Co., Inc.* v. *Rolkin*, 133 Cal.App. 209, 212 [23 P.2d 1065]; *Petrotta* v. *Gerson*, 98 Cal.App. 507, 513 [277 P. 167].)

*Jones-McLaughlin, Inc.* v. *Kelly*, 100 Cal.App. 315, 321 [279 P. 1076]: ''Elliot states the rule to be with respect to the second class of contracts, that such an agreement 'does not justify the promisor in arbitrarily, unreasonably and capriciously claiming that he is not satisfied, in order to evade liability, and the courts in doubtful cases, especially when the thing furnished is so attached to the real property of the buyer that its value would be lost to the seller, either wholly or in great part, unless paid for, are inclined to construe such a stipulation as one to furnish such a thing as ought reasonably to satisfy the buyer.' '' At page 324: ''It is clear that the contract in the present suit was one involving the operative fitness or mechanical utility of certain equipment attached to a concrete foundation imbedded in the ground adjoining an oil-well belonging to the purchaser. Likewise, it cannot be seriously questioned that the equipment here furnished was so attached to the real property that, unless paid for, its value would be lost in great part to the seller.''

If it were not otherwise self-evident, the testimony of Mr. Wilde and members of the board of the District would make plain that defendant's ''dissatisfaction'' with the proofs presented by plaintiff was a delaying stratagem based probably upon dissatisfaction with the contract in the light of political or other pressures.

Mr. Alfred Herman, president of the board, while insisting upon lack of notice of completion and refusal of access to the well for flow testing, rejected plaintiff's proffered proof out of hand because forsooth the affidavits were made by Riess and Scott, who were employees of the plaintiff; this in Herman's opinion rendered them worthless. He testified in part: "Mr. Riess presented this letter which made a demand for payment; and, in my estimate, speaking as one director, this was not proof. Signing an affidavit by Mr. Riess was certainly inadequate proof for the contract; and one by the employee, Mr. Scott, was again inadequate as far as the contract is concerned; at least, that was my feeling, and obviously the demand then for the $60,000 was out of order." . . . "These are affidavits of Mr. Riess and Mr. Scott who are parties to this agreement, and as such I could not evaluate them as any proof as such." Speaking of the affidavit: "My question is : Did you read it at the time it came in? A. I must say that I presume I did. I looked at it, but I looked at the signature and I said 'This isn't adequate proof.' "

Mr. Wilde took the same position, saying that he did not regard the letter of April 27 as furnishing information as to the source of the water and "I think that's a statement, and that's all it is. It doesn't compare or it doesn't show any proof."

Director Shumaker testified that the District relied upon lack of written notice of completion of the well: "Q. In other words, then, it is the District's position that Mr. Riess or the water company that succeeded to his rights did not give 'written notice to the District' following the alleged completion of the Yucaipa well? A. That is my understanding." He also said that he had no recollection of ever seeing Exhibit 7 or its enclosures. Also: "Well, my laymen's opinion is that a formal turnover, in other words, a written notice of turning over the well to the District, had not been received by the District so that the District could proceed with proper testing. That is my understanding and I think that I have stated that in conversation with other directors." He also said: "Q.—So that if I understand your testimony to this point, the District, as far as you as a Director was [sic] concerned, could never be satisfied that conditions of 9E had been met until you conducted your own tests based on information that you had in April, 1960, is that correct? A.—That is correct. Q.—And the District was not prepared to go ahead and make

any tests because it had not received the Paragraph 8 notice, is that correct? A.—Yes."

Mr. Hinckley, secretary and director of defendant, said on deposition that the staff was handling the matter and he would not know how to interpret the letter of April 27. But at the trial he swore that he saw the letter come into the office and immediately remarked, "Why, this is just similar to other wells in the vicinity," and further testified, "This didn't appear to me to be new water." He consulted no expert because he "was satisfied in my own mind that it wasn't new water." Under questioning by the court, he further said: "THE COURT: As I understand it, your position and it was generally the position of the Board that you were satisfied that you had a contract well, insofar as minimum production standards are concerned? THE WITNESS: That's right. THE COURT: The only reason you would not accept the well was that it could not comply with the terms of the contract which required the bringing in of new water? THE WITNESS: Exactly right. THE COURT: I think counsel is trying to find out why that position was not taken by the District in this letter. . . . Q. Can you answer that? A. No. If I had been writing the letter, I am sure I would have put it that way, but I didn't write the letter." On further cross examination: "Q. All this business in the correspondence and in the depositions about notice of completion and access to the well for further production testing is just so much nonsense; is that right? A. Well, I wouldn't say it was nonsense, but I think that you weren't arguing the meat of the matter. Let's put it that way."

Director Littleton testified that he had never seen the letter of April 27, 1960, but was told about it; that Mr. Wilde told him there had been nothing to compare the analysis with; also that no proof had been submitted which to his satisfaction proved this to be different water.

Neither director Ousley nor his successor, White, was called as a witness.

Though none of the directors nor Mr. Wilde had technical knowledge sufficient to apply the tests of contract paragraph 9(e), none of them sought the advice of an expert before the contract was made. Nor did they do so at the time the well was tendered to them as complete or at any time prior to a certain meeting of May 1, 1960, to which further reference

will be made.[6] A letter of August 20, 1960, from plaintiff's attorney, Frank Mankiewicz, to the District said: "At no time has the District challenged the validity of either of the proofs tendered to it."

Mr. Herman and Mr. Hinckley testified that the board instructed Wilde to inform plaintiff that defendant required additional proof of the source of the water, and both of them said that he said he had done so. But this hearsay must fall when read in the light of Wilde's testimony. In the early stage of the trial he testified: "Q. Did you tell Mr. Riess or any of his associates in the Water Company immediately upon receipt of that letter of April 27, 1960, that you needed additional information with reference to paragraph 9-E? A. I may have. I can't recall exactly now. I imagine we did. Q. You have no recollection one way or another? A. I don't have a recollection at this time." Later, when testifying for defendant: "Q. Now, after you received this affidavit and chemical analysis, were you in contact with Mr. Mendelsohn regarding a request for some proof of the source of the water? A. I can't tell you exactly. There were many conversations, and I assume I told him, because there was another meeting, and this was not acceptable to the board, and this was not considered proof." Surely this cannot be deemed substantial evidence contrary to that of Mendelsohn and Riess. Mendelsohn testified: "Q. . . . Up to the time that you sent the, or that the Water Company sent the letter of April 27, 1960, up to that time did Mr. Wilde or anybody else connected with the District ever raise with you any question or doubt about the source of the Yucaipa well water? A. Never." Riess testified: "Q. Now, did Mr. Wilde or any of the Directors challenge the accuracy of the things you had told them and the material you had presented? A. Never up until we came into litigation. . . . Q. . . . Up to the time the litigation started, and by that I mean the actual commencement of the suit, did Mr. Wilde or any of the Directors ask you to do anything in connection with elaborating on your theory about source? A. No, they did not."

---

[6]Our examination of the record has not disclosed the exact date of this meeting so we arbitrarily select and use May 1, 1960, as a logical approximate date. Mr. Herman, testifying about that meeting, said: "Q. Did anybody make a statement, anybody representing the District at this meeting, to the effect that the District was not yet satisfied that the Yucaipa well contained new water? A. I don't remember any such statement."

What constitutes substantial evidence is discussed in *Estate of Kuttler*, 185 Cal.App.2d 189, 204-205 [8 Cal.Rptr. 160]. The court there said in part: *"Reese* v. *Smith*, 9 Cal.2d 324, 328 [70 P.2d 933] : ' "If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary. (*Patterson* v. *San Francisco etc. Ry. Co.*, 147 Cal. 178 [81 P. 531].) A judgment cannot be based on guesses or conjectures. (*Puckhaber* v. *Southern Pac. Co.*, 132 Cal. 363 [64 P. 480].) And, also, 'A finding of fact must be an inference drawn from evidence rather than on a mere speculation as to probabilities without evidence. A majority of chances never can suffice alone to establish a proposition of fact, since the slightest real evidence would outweigh all contrary probabilities.' (23 C.J., § 1750, p. 18.' ' ' . . . *Sweeney* v. *Metropolitan Life Ins. Co.*, 30 Cal.App.2d Supp. 767, 772 [92 P.2d 1043] : . . . What constitutes substantial evidence, as distinguished from mere possibility or speculation, is clarified in the following passage from *Estate of Teed, supra,* 112 Cal.App.2d 638, 644 [247 P.2d 54] : 'The sum total of the above definitions is that, if the word "substantial" means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' *Fewel & Dawes, Inc.* v. *Pratt*, 17 Cal.2d 85, 89 [109 P.2d 650] : 'If, however, the evidence is so slight and tenuous that it does not create a real and substantial conflict the finding may be set aside. (*Ibid.*) "There must be more than a conflict of words to constitute a conflict of evidence." ' "

█ In this, as in every contract, there is inherent an "implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 771 [128 P.2d 665].) (*Calabrese* v. *Rexall Drug & Chemical Co.*, 218 Cal.App.2d 774, 782 [32 Cal.Rptr. 665].) █ This requires that rejection of performance of a satisfaction contract be made in

good faith, with reasonable promptness, and with an explanation of the grounds of dissatisfaction so that defects in performance may be cured if possible. 17 American Jurisprudence, Second Edition, section 366, page 809: "He [the promisee] may not act arbitrarily or capriciously or merely feign dissatisfaction, nor can he avail himself of his own fraud or bad faith to escape liability on his contract." *Id.*, section 368, page 811: "One's right to avoid liability under a satisfaction clause in a contract may be lost by conduct amounting to a waiver or estoppel. It has been held that where a contract provides that performance is to be made to the satisfaction of a party, but such party does not express disapproval of the performance or expressly reject the work because of dissatisfaction, he may be held liable for the work done, even though he has someone else do the work to his better satisfaction." See also 17A Corpus Juris Secundum, section 495(1), page 722; *Hood* v. *Meinenger*, 377 Pa. 342 [105 A.2d 126, 128-129, 44 A.L.R.2d 1106].

Moreover, an agreement for making of tests to determine the proper application of the objective standard of satisfaction is not only binding but also governs the various facets of the test which are prescribed by the contract (17 Am.Jur.2d, § 372, p. 815; 17A C.J.S., § 495(1), p. 721; 90 A.L.R.2d par. 15(d), p. 1369; *Williams* v. *Hirshorn*, 91 N.J.L. 419 [103 A. 23]; *Utley* v. *Stevens*, 221 Ala. 666 [130 So. 405, 408]; *Capps* v. *Johnson* (Tex. Civ. App.) 160 S.W. 1097, 1098). The instant agreement is on a parity with a contract leaving to a third party the determination of questions such as quantity, quality, value of property or services, or a common-law arbitration; the decision is binding in the absence of fraud or mistake (*Kinkle* v. *Fruit Growers Supply Co.*, 63 Cal.App.2d 102, 107-108 [146 P.2d 8]; 12 Cal.Jur.2d, § 220, p. 442.)

In *Hagadorn* v. *McNair*, 109 App.Div. 759 [96 N.Y.S. 417], plaintiff had agreed to drill a well for defendant at no charge until the well had "been thoroughly tested and found to produce 20 barrels of water in each 24 hours." On testing, the well failed to produce the required quantity. At pages 418-419 [96 N.Y.S.], the court said: "Both agree that the defendants were to test the well, and to accept or reject it within 30 days after its completion; and, if not accepted, the plaintiff was 'to come back and dig deeper.' The price in the old contract continued and was to cover the entire depth

drilled. The plaintiff drilled to a depth of 108 feet, made a preliminary, although not certain, test, and believed there was ample water according to the agreement. This was the latter part of October, and he at once notified the defendants and told Mr. McNair to put in his pump and test promptly to prevent the loose rock falling in the hole. The defendant put a pump in place, but made no test at all during the 30 days. . . . The purpose of the agreement was to secure to the defendants a well producing daily 20 barrels. The plaintiff was to receive no compensation unless he met this condition. It was a venture for him, and, in order that in the end he might be compensated for the labor and time expended, certain provisions of the agreement enured to his benefit. The defendants were to accept or reject the well within 30 days after they were notified of its completion. They were not to delay their test indefinitely and thus prevent the plaintiff from knowing whether he had failed or won in his experiment. . . . If the defendants did not accept the well, then the plaintiff was to make another experiment and drill deeper. After the second drilling the well produced more water than at the first effort, and a continuation of the drilling might have discovered the required quantity of water. These provisions were valuable to the plaintiff and were saving conditions to enable him to make the fullest endeavor to secure a 20-barrel well in order that he might obtain the money he had earned. The defendants neither accepted nor rejected the well. They made no test. They never gave him the opportunity to drill deeper. . . . While the gravamen of the agreement was to secure the desired well, yet the strict obligation imposed upon the plaintiff must be construed in the light of the burdens accepted by the defendants. They have slumbered on their rights, and have made what might have proved a fruitless experiment a valuable one to the plaintiff.''

*Estes* v. *Curtiss Aeroplane & Motor Corp.*, 191 App.Div. 719 [182 N.Y.S. 25] involved a contract to furnish to defendant lumber for use in manufacturing aeroplanes for the government. Dissatisfied with former experiences, plaintiff insisted that any inspection not be done by the government and it was so agreed, a certain named inspector being designated for that purpose. Shortly after performance of the contract had begun defendant notified plaintiff that white ash would be subject to inspection by a government representative at the point of shipment. Plaintiff refused to perform further,

claiming repudiation of the contract by defendant. The court said at p. 26 [182 N.Y.S.] : "If the parties agreed upon a method of inspection, and the person to do the inspecting, that agreement was binding upon both parties, and the plaintiff was not required to proceed with the performance of the contract in the face of the claim which the defendant made that the lumber was to be subject to government inspection. That was the very thing against which the plaintiff contracted, and I think it is no answer to say that, if the lumber in fact came up to the requirements, it was immaterial who inspected it. . . . It was not necessary that the plaintiff should manufacture and tender the lumber to the defendant in order to maintain the action. When the defendant repudiated a material provision of the contract, there was an anticipatory breach, and the plaintiff could rescind the contract and recover his damages for a breach thereof." The Court of Appeals, adopting the reasoning of the Appellate Division, affirmed its ruling 232 N.Y. 572 [134 N.E. 576].

■ *Electric Lighting Co.* v. *Elder*, 115 Ala. 138 [21 So. 983] is pertinent. Plaintiff agreed to drill a well for defendant at plaintiff's expense. Paragraph third of the contract said: "The water flowing from said well is to be deep-strata water, and no strainer will be placed to obtain flow from intermediate or intervening strata, as water from that source is likely to be of such quality as is not adapted to the use of the party of the second part." Payment of a price of $1,875 was to be made by defendant 30 days "after satisfactory completion of the well." In response to plaintiff's suit for the price, defendant claimed "that there had never been any satisfactory completion of said well, or that said well as completed was not satisfactory to defendant, because the latter, being the owner of and operating an electric lighting plant, and desiring a supply of water for use in its boilers for the purpose of generating steam, entered into said contract for the purpose of procuring said water, which facts the plaintiffs well knew, and that the water furnished by said well was wholly unfit for use in said boilers. This defense is based upon the theory that inasmuch as the plaintiffs knew the purpose for which the water was wanted, and, by the terms of the contract, the work was undertaken at their own risk and expense, and the payment of the compensation was made contingent upon its satisfactory completion, they therefore assumed the risk of procuring water suitable for use in de-

fendant's boilers, and that, failing in this, there was no 'satisfactory completion' of the well, and, consequently, no such performance by plaintiffs as entitled them to demand the stipulated compensation." At page 986, the court said: "It may reasonably be assumed, in construing the contract, that both parties were ignorant of the quality of deep-strata water that could be reached by the well. But both knew or had reason to believe that water from any intermediate strata would be unsuitable. And it was this ignorance as to the one, and knowledge as to the other, that probably led to the insertion in the contract of the third paragraph, . . . The parties having in this paragraph provided that the water should be from deep strata, without any reference to its quality, and declared that water from any intermediate strata would not be suitable, we cannot conclude otherwise than that either the defendant believed that the deep-strata water would be suitable, or, being in ignorance as to its quality, it was the intention of the parties that it, and not the plaintiffs, should assume all risk as to its suitability." At page 987 [21 So.] : "Having voluntarily assumed the obligations and risks of a contract, their legal rights and liabilities are to be determined solely according to its provisions. . . . In a case like the present one the party cannot capriciously refuse to accept the work. He must be in good faith dissatisfied. He cannot avoid liability by merely alleging that he is dissatisfied. He is bound to be satisfied when he has no reason to be dissatisfied. He must fairly and honestly test the work, exercising such judgment and capacity as he has. The dissatisfaction must not be capricious, nor mercenary, nor result from a design to be dissatisfied. It must exist as a fact. It must be actual, not feigned ; real, not merely a pretext to escape liability." Page 988 [21 So.] : "It should be observed that it is not the well with which, by the terms of the contract, defendant is to be satisfied, but the completion of the well by plaintiffs in substantial compliance with their promises. The dissatisfaction which can be set up as a defense to the action must not be caused, in whole or in part, by the quality of the water, nor by any considerations other than such as are connected with the sufficiency of plaintiffs' performance of their contractual obligations. If defendant had no reason to be dissatisfied with such performance, it was bound to be satisfied. ▮ This only means, however, that, the fact of dissatisfaction being for the jury to determine, it may reasonably be inferred that,

if there was no reason for its being dissatisfied, it was in fact satisfied.''

The normal sequence of events under the subject contract would be this: After receiving notice of completion of the well, the District should have accepted or rejected the well (its flow test having been made previously) and if it claimed dissatisfaction it should have specified the particulars and grounds of same, whereupon plaintiff could have prepared and produced further proof of the nature specified in paragraph 9(e) or could have made additional flow tests if the production capacity of the well was questioned. The District equivocated and kept plaintiff under heavy financial pressure; as later appeared, the District was seeking a lawsuit, friendly or otherwise.

The District had the obligation under paragraph 8 to test the well with its own implements and at its own cost. That paragraph required Riess to give written notice of completion of the well and the District was obliged to conduct promptly after such notice a production flow test for a maximum of 30 days. Acceptance of the well was due 30 days from completion of the pumping tests, and payment of one-third of the amount due for drilling the well was to be made upon completion of a flow test establishing the rate of flow. The letter of April 27, 1960, as found by the court, gave that notice of completion, the flow tests had been completed prior to that date, defendant sought no further opportunity to test, and the payment of one-third of the cost of the well became due within 30 days after April 27, 1960. Plaintiff had spent $187,000 in its drilling of the two Blu-Cut wells and this one well, Yucaipa No. 1, to which it devoted $62,399.13. Mendelsohn, the officer who personally was carrying the financing, was anxious for payment of $60,000 as the cost of the last mentioned well. Failure of defendant to apprise plaintiff of the fact of its alleged dissatisfaction or to specify particulars thereof tied defendant's hands so far as concerned assembling or producing additional proofs such as those specified in paragraph 9(e) of the contract, or making additional tests at its own expense for that period.[7]

---

[7]The contract, while not specifically affording such right to plaintiff before acceptance of the well does so provide inferentially in paragraph 6, where it says that Riess ''shall commence drilling and continue without unreasonable delay or lack of diligence until it is determined whether said well complies with the provisions of this contract or is abandoned.''

Paragraph 10(b) says that "subject to future tests of the well indicating whether or not there has been any change in its flow," the unpaid two-thirds of the price shall be payable in equal installments. Also: "Not less than 60 days prior to the due date of each annual installment, the District at its own expense or Riess at his own expense may conduct pump tests on each well drilled pursuant to this Agreement." It also provides for the making of appropriate adjustments in the price in case of change in the flow. Plainly, the spirit of the contract as well as the implied covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (*Universal Sales Corp.* v. *California etc. Mfg. Co., supra,* 20 Cal.2d 751, 771) warrant the implication of a right in Riess to make additional flow tests or other tests in order to demonstrate his fulfillment of his contract obligations. This implied intent squares with the authorities touching upon the particular subject which are cited *supra,* and with *Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 869 [44 Cal.Rptr. 767, 402 P.2d 839] quoted *infra.*

Defendant's conduct definitely precipitated the meeting of May 1, 1960, at which Mendelsohn on behalf of plaintiff earnestly endeavored to effect some sort of compromise that would produce $20,000 cash in hand. At that meeting it was suggested by defendant that a friendly lawsuit be brought, that it be lost by the District, and the status of the water thus determined. When the contract was under negotiation, Mr. Riess had refused to buy a lawsuit and hence paragraph 12 was inserted in the contract whereby the District agreed to hold Riess harmless and he agreed to assist it by supplying information and technical opinion and advice in defending any claim brought against the District. At this May 1 meeting, defendant renewed the original suggestion. Plaintiff's representatives flatly rejected it. Seven different points of possible agreement were discussed at that meeting and an understanding had that a letter covering same should be written. Apparently each party thought the other was to prepare and send it. Finally, defendant forwarded to plaintiff a "7-point" letter dated May 11, 1960 (Ex. 8). Its terms were unacceptable to plaintiff, and defendant was so advised by letter of August 20, 1960. In the meantime, the defendant's

264

board of directors had passed on June 1, 1960, a resolution "that manager be authorized to proceed to have a pump furnished and installed on a rental basis, and provisions made to negotiate for the sale of water, the necessary pipeline to pipe the same to place of use." On September 8, 1960, Mr. Webb, attorney for the District, wrote plaintiff's attorneys insisting that the well could not be accepted until after a satisfactory testing, and plainly implying that it was Riess' obligation to initiate the same. Of course that was incorrect; moreover, the only test ever requested by defendant had been made for a period of 24 hours only. Aside from more conversations and letters, nothing happened prior to suit brought except that defendant on July 7, 1961, gave plaintiff notice of termination of the agreement, purporting to act pursuant to its paragraph 11. It never has been established that the well upon proper pumping with adequate equipment will not yield the prescribed amount of water. The matter came to rest upon the note voiced by Mr. Wilde in his testimony: "So I went to the board and recommended to the board that we try for 24 hours to see if we could ascertain what might be his problem or where the problem was. Q. Now, did you find out what the problem was? A. No. I still don't know." ▉ Plainly, the burden rested upon the defendant to do any necessary flow testing and to do it with machinery procured by it and at its own cost, failing which it was obligated to accept the well without further proofs.

The court, though denying plaintiff any recovery of all or any part of its expended $187,000, enjoined defendant from "drilling, developing, pumping or otherwise exploiting or using any of the wells drilled or partially drilled by plaintiff at Yucaipa and/or Blu-Cut." This seems a tacit judicial recognition of some lack of equity in the decision. Under it plaintiff is paid nothing, the well is on land belonging to defendant, and plaintiff cannot use the well or dispose of it; at the same time, defendant is enjoined from reaping any benefit from it.

▉ When a contracting party who claims satisfaction from the other fails to proceed with performance of his own obligations and thus obstructs the efforts of the other party to show that a reasonable man would be satisfied in existing circumstances, he has committed a breach of contract which excuses further performance by his promisor (17A C.J.S., § 468, p. 638). ▉ "Each party to a contract has a duty

to do what the contract presupposes he will do to accomplish its purpose. (*Bewick* v. *Mecham,* 26 Cal.2d 92, 99 [156 P.2d 757, 157 A.L.R. 1277].) Thus, 'A party who prevents fulfillment of a condition of his own obligation . . . cannot rely on such condition to defeat his liability.' (*Bewick* v. *Mecham, supra,* 26 Cal.2d at p. 99; *Pacific Venture Corp.* v. *Huey,* 15 Cal.2d 711, 717 [104 P.2d 641].)" (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 869 [44 Cal.Rptr. 767, 402 P.2d 839].) ▮▮▮ "A rejection of the work as unsatisfactory is premature if the work is not sufficiently completed for a reasonable determination whether it is or will be satisfactory." (17A C.J.S., § 495(2), p. 723.) 90 American Law Reports, Second Edition, Annotation, section 9, page 1360: "It has generally been held or recognized that a driller is justified in abandoning a drilling contract and may nevertheless recover for the work done where, without fault on the part of the driller, the landowner terminates the contract before completion or prevents the driller from fully performing it."

The trial of this case made a unique record in numerous respects. The reporter's transcript comprises some 4,000 pages and there are approximately 150 exhibits. The length and complexity of the trial were due principally to the injection of the issue of the actual source of the water in the Yucaipa well, whether it is intrinsically "new water," regardless of any showing made by plaintiff under contract paragraph 9(e). During negotiation of the contract Mr. Riess had refused to buy a lawsuit and the same thing occurred on May 1, 1960, when the parties were seeking a compromise of their differences. The controlling issue of this case necessarily was and is compliance with paragraph 9(e) of the contract, not the question of whether other types and quantities of proofs would establish that the water of the particular well possesses the qualities specified in the contract; or, to state it differently, whether the defendant was or should have been satisfied with proofs specified in paragraph 9(e) (original or supplemental ones), not whether a court after independent investigation would hold that the well did comply with paragraph 9 in its entirety.

The issues joined by the pleadings and enlarged by the joint pretrial statement and order adopting the same were at the trial further enlarged by common consent of counsel and the judge. (See *Collison* v. *Thomas,* 55 Cal.2d 490, 498 [11

Cal.Rptr. 555, 360 P.2d 51]; *Johnson* v. *Servaes,* 210 Cal. App.2d 392, 400 [26 Cal.Rptr. 733]; *Hodges* v. *Lochhead,* 217 Cal.App.2d 199, 205 [31 Cal.Rptr. 879].)  ▇▇▇ The transcript discloses that practically everything that either side suggested—beginning with the initiation of negotiations and extending over the entire history of the well and the contract —was canvassed by the opponent and then by the declarant. Witnesses were permitted, with practically no objections other than occasional ones directed to the form of a question, to testify as to what they thought of Riess and his theory, what they understood to be the meaning and intent of various portions of the contract, especially paragraphs 8 and 9(e); what they understood to be the meaning of things said and done by others. The experts had read the daily transcript and appraised for themselves the previous testimony of other expert and nonexpert witnesses and testified as to the soundness of their conclusions. All of this is patently incompetent.[8]

▇▇▇ If the contract was claimed to be ambiguous, the party so contending would be obligated to plead the nature of the ambiguity and the proper construction and the court would have the duty to find thereon. (See *Sutter* v. *Gamel,* 210 Cal.App.2d 529, 532 [26 Cal.Rptr. 880]; *Silvers* v. *Grosman,* 193 Cal. 696, 700 [192 P. 534]; 39 Cal.Jur.2d, § 63, p. 94.)

Throughout the trial counsel were engaged principally in waging the issue of whether the well actually had its source outside the Santa Ana River watershed regardless of proofs presented under paragraph 9(e) of the contract. Direct and indirect charges of fraudulent representations were advanced against Mr. Riess though not within the scope of the pleadings or the pretrial order, but the court permitted defense counsel to pursue them in the face of appropriate objections.  ▇▇▇ Of course, hearsay and conclusions, though incompetent, may be sufficient to support a finding where received without objection, but they should be evaluated by the trial court for what they are worth (*Estate of Moore,* 143 Cal.App.2d 64, 74 [300 P.2d 110]); that is the function of the trial judge, not the reviewing court. There undoubtedly

[8] 32A C.J.S., § 960(b), p. 410; *Id.,* § 852, p. 219; *Id.,* § 960(g), p. 425; 18 Cal.Jur.2d § 277, pp. 767-8; 12 Cal.Jur.2d, § 120, p. 329; *Payne* v. *Commercial Nat. Bank,* 177 Cal. 68, 72 [169 P. 1007, L.R.A. 1918C 328]; *Lobrovich* v. *Georgison* 114 Cal.App.2d 567, 573 [301 P.2d 460]; *Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d 861, 865-866 [44 Cal. Rptr. 767, 402 P.2d 839].

is a substantial conflict in the evidence concerning this issue, tried independently of those previously framed, and it cannot be contended and is not contended that there is insufficient evidence to support the finding which the court made to the effect that the water in the well was not such as prescribed by the contract.

Except for one phase of the matter, this court would have to hold that plaintiff had the kind of trial it wanted and must be content with the result. That exception arises from the fact that counsel for plaintiff never waived the point that plaintiff's rights are to be measured by paragraph 9(e) and not otherwise; this position was made clear by counsel on several occasions, especially in special requests for findings, relying upon sections 632 and 634, Code of Civil Procedure.

For many years it has been established that failure to find upon a material issue works reversible error (*Parker* v. *Shell Oil Co.*, 29 Cal.2d 503, 512 [175 P.2d 838]; *Centerville Amusement Co.* v. *Salih*, 199 Cal.App.2d 106, 112 [18 Cal. Rptr. 671]; *Morrow* v. *Morrow*, 201 Cal.App.2d 235, 238 [20 Cal.Rptr. 338]). The rule was strengthened by the 1959 amendments to said sections 632 and 634. The following sentence was thereby inserted into section 632: "The statement of facts found shall fairly disclose the court's determination of all issues of fact in the case." And the following was added to section 634: "If upon appeal or upon a motion under Section 657 or 663 of this code it appears that the court has not made findings as to all facts necessary to support the judgment, or that the findings are ambiguous or conflicting upon a material issue of fact, the court before which such appeal or motion is pending shall not infer that the trial court found in favor of the prevailing party on such issue if it appears that the party attacking the judgment made a written request for a specific finding on such issue either prior to the entry of judgment or in conjunction with a motion under Section 663 of this code."

Volume 34, page 639 of the Journal of the State Bar of California says: "Sections 632 and 634 of the Code of Civil Procedure contain the basic statutory authority for determining when findings must be made and what issues such findings must cover. *The purpose of the present amendments is to force findings on controverted facts and to insure an accurate review of the legal issues as applied to the facts found.*" "Previously, if findings were required they had to

be made only on 'material issues' (see *Diefendorff* v. *Hopkins*, 95 Cal. 343 [28 P. 265], aff'd in bank, 30 P. 549 (1892)). *Now § 632 requires that findings 'shall fairly disclose the court's determination of all issues of fact.'* Hence, the failure of the findings fairly to disclose the determination of any issue of fact is error, and if prejudicial, it will justify reversal. The phrase, 'shall fairly disclose' does not appear susceptible of any accurate yardstick. While it probably does not require separate findings on all issues of fact, it would appear to require, in those situations covered by § 634, something more than findings from which omitted findings could be inferred." [Italics added.]

In *Culbertson* v. *Cizek*, 225 Cal.App.2d 451, 465 [37 Cal. Rptr. 548], the court referred to the rule stated in *Richter* v. *Walker*, 36 Cal.2d 634, 640 [226 P.2d 593], as follows: " '[W]hile full findings are required upon all material issues a judgment will not be set aside on appeal because of a failure to make an express finding upon an issue if a finding thereon, consistent with the judgment, results by necessary implication from the express findings which are made.' " The court then continued: "However the above rule set forth in *Richter, supra,* is not operative where the appealing party made a written request in the trial court for a specific finding on the issue in controversy. . . . The trial court, however, denied plaintiffs' objections and requests. Under the mandate of Code of Civil Procedure section 634 we cannot now infer that the court found on the foregoing issues and conclude, as United would have it, that that was the *effect* of the findings which were made." (P. 466.)

This question of necessity of a finding presupposes a substantial conflict in the evidence. Had the court accepted the testimony of Dr. George Kennedy dealing with the technical field involved it probably would have made specific findings upon this matter of the proofs tendered by plaintiff with its letter of April 27, 1960. Dr. Kennedy not only is Professor of Research at the Institute of Geophysics, University of California at Los Angeles, but he also has a doctorate in mining geology, a Ph.D. in geology, has been a professor in geophysics and of chemistry, is consultant to Jet Propulsion Laboratory and Lawrence Radiation Laboratory, an exceptionally qualified expert. He testified that he found eight significant features of this well and its water: "There are about eight features that I consider significant in connection

with this water that all point to source . . . One is the general geology. Two would be the area of the drainage basin. Three would be the chemistry of the water. Four, the tritium. I am trying to write down everything we know about the well. Five, the evidence of diurnal fluctuations. Six, evidence as to annual fluctuations. Seven, the temperature of the water. . . . Oh, yes, eight, static.'' He also said that any three of them would satisfy his mind: ''If you prove to me that there are three of these together, I think they are conclusive, and if they were different than they are, I would say it was obviously local water.'' In view of the enormous amount of new data produced since he was originally on the stand, he, when called in rebuttal, reduced the number of significant features to seven. This means that the three proofs mentioned in paragraph 9(e) (also included in Kennedy's seven factors) would satisfy his mind as to the correctness of plaintiff's position. Regardless of whether the court believed this testimony, it presented a substantial conflict with the evidence of other experts and urgently called for a specific finding.

The court made no oral summation of the case and filed no written memorandum, but ordered the matter submitted on October 9, 1962, and decided it by minute order of the following day without any explanation of the ruling. This leaves the reviewing court no way to determine the exact basis of the ruling except by a comparison of the findings as signed with the plaintiff's requests for specific findings.

The amended complaint alleges in paragraph 12 that ''On or about April 8, 1960, Plaintiff completed the drilling of the Yucaipa Well. On or about April 27, 1960, Plaintiff tendered proof to Defendant District that the said well and the water thereof met the requirements of the Agreement, to wit, the water from the said well is 'not derived from the Santa Ana River Watershed' and that the well 'does not constitute a substitute extraction site' for water from the Santa Ana River Watershed. Such proof was thereupon furnished in writing by Plaintiff to Defendant District by two of the methods described in Paragraph 9(e) of the Agreement, to wit, by determination of the static head of such newly discovered water source and by chemical analysis.'' The answer denies ''generally and specifically, each and every, all and singular, the allegations contained in paragraphs . . . 12. . . .'' The court found in XI that ''plaintiff failed to tender proof to defendant district as required by paragraph

9, of the contract that the water produced from the well at the Yucaipa site was 'not derived from the Santa Ana River Watershed', that the Yucaipa well water 'constitutes a new source of water for the area served by defendant district', and that the well 'does not constitute a substitute extraction site'.'' This is not a finding that proofs were not tendered, but an indirect statement that they did not prove what they professed to prove; this is made clear by the finding immediately following: ''That the water produced from the plaintiff's well in Yucaipa is not new water to the Santa Ana River Watershed''; also by finding VII, which states that the major portion of paragraph 14 of the complaint is untrue. If intended to say that plaintiff never presented proofs, the finding would be manifestly untrue and opposed to uncontradicted evidence, or, worse than that, a quibbling over the meaning of the word ''proofs.''

The findings actually made go to the issue of whether the water of the Yucaipa well had its source outside the Santa Ana River watershed as a matter of independent evidence and regardless of what plaintiff's proofs under paragraph 9(e) showed and would have shown to a reasonable man or would or could have shown had plaintiff had an opportunity to supplement them.

Finding XVII to the effect that defendant did not by its conduct prevent plaintiff from satisfying the source requirement of paragraph 9(e) is not only contrary to the evidence, as above shown, but is also tied in with finding XVIII, which says: ''That defendant did not owe any duty to plaintiff to pump test the Yucaipa well, employ experts or perform any other tests under paragraph 9 of the contract, under the facts and circumstances prevailing at or about the time plaintiff gave notice of completion of the well and made demands on defendant for payment.'' The last clause beginning with the words ''under the facts'' is palpably a conclusion which obscures the judge's thought. It must therefore be disregarded (*Miller* v. *Gusta*, 103 Cal.App. 32, 37 [283 P. 946]; *Estate of Craycroft*, 191 Cal.App.2d 436, 444 [12 Cal.Rptr. 552]; *Relaxacizor, Inc.* v. *W. B. Geissinger & Co.*, 221 Cal. App.2d 19, 22 [34 Cal.Rptr. 269]; *Culbertson* v. *Cizek, supra*, 225 Cal.App.2d 451, 465).

The findings just discussed are insufficient under section 632, Code of Civil Procedure when considered in the light of the special requests for findings. No. 1 of the requests

calls for a finding as quoted in the margin.[9] No. 6 is set forth in footnote 10. No. 11 is set forth in footnote 11. The court's refusal of these requests goes to the heart of the case and avoids a determination of the real issue.

The state of the findings and the refusal of the court to make specific findings upon crucial issues in the case spell reversible error.

Judgment reversed.

Ford, Acting P. J., and Kaus, J., concurred.

A petition for a rehearing was denied August 30, 1965, and respondent's petition for a hearing by the Supreme Court was denied September 29, 1965.

---

[9]"1. What the parties intended and meant by the language of paragraph 9(e) of the contract. In this connection, plaintiff proposes that the Court find that: (a) It was the intention of the parties that the source requirement would be satisfied if any one of the three criteria of proof, i.e. static head, H-3 Isotope Test, or chemical analysis, were met; (b) that by the 'static head' criterion, the parties meant a high static level which would not be affected by wet and dry seasonal fluctuations, which would maintain itself and exhibit a rapid recovery notwithstanding the pumping out of large quantities of water and which, by its relation to the static levels of neighboring wells, would indicate that a common water table was not involved; (c) that by the chemical analysis criterion, the parties meant a comparative test to ascertain whether the water in a contract well, by its chemical analysis, would be significantly different from waters of neighboring wells; (d) that by the H-3 Isotope Test, the parties meant comparative tests to ascertain whether the water in a contract well, by tritium analysis, was significantly different from the waters of nearby wells; and (e) *that in any event the parties intended that the defendant, not a court of law, or other person or entity, be reasonably satisfied on the question of source of water in a contract well.*" [Italics added.]

[10]"6. Whether the defendant fairly and reasonably analyzed and evaluated the data and information received from plaintiff and other sources, during the relevant period, with respect to the source of the water in the Yucaipa Well. It is plaintiff's contention that defendant did not do so."

[11]"11. Whether defendant, within a reasonable period of time after plaintiff offered the Yucaipa Well to defendant and demanded payment therefor, reasonably and fairly apprised plaintiff of its dissatisfaction, and the basis therefor, as to the source, pumping level and yield of the Yucaipa Well. In this connection, plaintiff proposes a finding that defendant did not so apprise plaintiff."