[Civ. No. 27160. Second Dist., Div. Two. July 31, 1963.]

JAMES CALABRESE et al., Plaintiffs and Respondents, v. REXALL DRUG AND CHEMICAL COMPANY, Defendant and Appellant.

Marilyn Sue Barton for Defendant and Appellant.

Francis Ray Brown and Arthur H. Nielsen for Plaintiffs and Respondents.

ASHBURN, J.—Action for rescission, damages, injunction and declaratory relief. Plaintiffs are relatives by blood or marriage of Samuel Ray Calabrese,[1] who directly or through corporations controlled by him[2] had purchased, between April 1, 1959, and May 9, 1960, four operating drug stores from Owl Drug Co. (a subsidiary of Rexall Drug & Chemical Company, later merged into it) and had given as consideration therefor six promissory notes upon which there was unpaid principal in the amount of $169,370 on March 1, 1961. Sam was personally liable on all of them and plaintiffs James, Samuel, Jr., and Mario were also obligated as makers of one of the notes in the principal sum of $74,737.63. The three had an interest in the drug stores or gained their living through their operation. Defaults soon occurred in payments due under the notes, and the situation reached the point where, on or about February 11, 1961, Sam met with Mr. Fisher, the president, Mr. Clemenson, the vice-president of Owl, and Mr. Krieger of North American Credit Association, and there offered or agreed to give security to be furnished by members of his family. This and subsequent meetings eventuated in a written agreement of March 1, 1961, the one which plaintiffs successfully sought to have rescinded herein. From the judgment so declaring, defendant appeals. It makes no claim of insufficiency of the evidence to support the findings except in some minor respects.

---

[1] As at the trial, first names will be used herein for convenience, all eight plaintiffs and Sam being named Calabrese.

[2] Cal-Cam of California, Cambrese, Inc., and Vanca, Inc.

The major contention made by appellant is that the court erred in receiving parol evidence to aid in the interpretation of the agreement, appellant claiming that it was free from ambiguity and that, construed within its four corners, it plainly disproved plaintiffs' claim of failure of consideration which was the principal ground of rescission.

The agreement, which names plaintiffs as purchasers, provides that: "1. Owl hereby agrees to *sell, transfer and assign,* subject to the terms, provisions and disclaimers of liability set forth herein, to the PURCHASERS, those certain six (6) promissory notes and that certain guarantee of one of said promissory notes, of which photo-copies are attached hereto as Exhibit 'A'. . . ."[3] (Italics added.) The purchase price was fixed at $169,370, to be represented by purchasers' promissory note in said sum which was to be delivered simultaneously with the agreement; purchasers were to deliver within five days the securities listed in an attached exhibit, together with appropriate instruments of transfer, said securities to have fair market value of at least $175,000. These securities consisted of deeds to the homes of James, Samuel, Jr., Charles and Mario, and their wives, together with certain mortgages, trust deeds, a hotel owned by James, certain shares of stock and certain intangibles. Owl was to determine "the fair market value with the aid of independent experts whom it might consult." When satisfied in that respect Owl was to notify the purchasers and meet with them "at such time and date as OWL reasonably may designate within five (5) days following mailing or delivery of such notification by OWL to the PURCHASERS *for the purpose of the delivery by* OWL *to* PURCHASERS *of the* NOTES, together with such additional instruments as may be appropriate or necessary in order to assign and transfer any and all interest of OWL on such date in the NOTES to the PURCHASERS in conformity with the

---

[3]Paragraph 3 also provided: ". . . The parties hereto further agree and understand that any assignment and transfer pursuant to the terms of this Agreement is without recourse against OWL and that in no event shall the PURCHASERS, or any PURCHASER, his executors, administrators or assigns have any recourse against OWL, or the successors or assigns of OWL for any sum of money representing principal, interest, collection, or other charge or cost which is not paid by said maker or makers of the NOTES or any guarantee thereof, or otherwise. The parties hereto further agree and understand that except as may be expressly set forth herein, this Agreement does not contain, and is not to be construed to contain, any guarantee, warranty or representation of any kind or character whatsoever, whether expressed or implied."

terms, provisions and disclaimers of liability set forth in this Agreement.'' (Italics added.) Paragraph 17 of the agreement provides: ''This Agreement contains the entire agreement between OWL and the PURCHASERS relating to the subject matter hereof. No verbal understandings, statements, promises or inducements contrary to the terms of this Agreement exist.''

On April 20 and 21, 1961, Owl received from respondents the promissory note for $169,370 and all of the promised securities, whereupon performance of Owl's obligation to deliver the six notes became due in five days. But they never were delivered. Between April 21 and June 6, 1961, Owl requested of plaintiffs ''a security interest in additional property, or alternatively an agreement to re-assign to The Owl Drug Co. said six (6) promissory notes,'' which request was not in accordance with the written contract of March 1, 1961. Plaintiffs did not comply and the six notes were not delivered to them, but on June 6th Owl delivered an assignment of the said notes, containing the language set forth in the footnote.[4] On the same day defendant served upon Sam's corporations notices to pay all delinquent rents within three days, failing which an unlawful detainer action would be filed to evict them from their drug stores, and Owl notified the creditors of said corporations that said action had been taken. That suit was filed at some time prior to June 18, 1961.

Plaintiffs employed attorney T. G. Klinger to obtain the

---

[4] ''Assignor has made, makes and will make no representation, warranty or guarantee as to the due execution, validity or value of the Notes, except that Assignor represents that Assignor has not heretofore assigned or transferred any interest which Assignor has in the Notes to any other person or persons. Assignees understand that the maker or makers of the Notes are at the present time in default of each of the Notes by reason of the failure of said maker or makers to pay certain sums of principal and interest which heretofore have become due and payable to Assignor pursuant to the provisions of the Notes; further that said maker or makers of the Notes may be in default under the notes by reason of violations of and failure to comply with the terms, provisions, covenants and conditions which may expressly be contained in the Notes or any one of them or incorporated therein by reference and further that any such default and the enforcement of any right or remedy available to the holder under the Notes may heretofore have been waived, lost or abandoned by reason of the passage of time or otherwise.

''This assignment and transfer of the Notes is without recourse against Assignor and in no event shall the Assignees or any of them or the executors, administrators or assigns of Assignees or any of them have any recourse against Assignor or the successors or assigns of Assignor for any sum of money representing principal, interest, collection or other charge or cost which is not paid by said maker or makers of the Notes or any guarantee thereof or otherwise.''

notes for them. On June 30, 1961, he wrote to Owl requesting delivery of the notes. Defendant, through its attorney, demanded evidence of Klinger's authority to act and for whom. This he supplied in a letter of July 25, which also contained these passages: "Further to answer your letter, although the information requested does not appear material, said assignees were informed orally at the Pasadena store when they signed the trust deeds and turned over the documents of security, that the notes which were being assigned to them would be sent to them. I believe they were informed of this by Mr. Fisher and Mr. Clemonson. In any event, the assignment of June 5, 1961 of said promissory notes is unconditional, the assignment has been delivered to the assignees and the property assigned should, therefore, be transmitted to me as their authorized representative. I think you will agree that whenever any property is assigned by a document of assignment, the property itself must then be delivered to the named assignees. I would therefore appreciate your forwarding said promissory notes to me promptly." Klinger reiterated this request on July 28th and was told by letter of August 30th from Owl's attorney that the notes had been stolen and could not be delivered: "In response to your letter of July 28, 1961, please be advised that the following original Promissory Notes, together with the safe in which they were deposited, were feloniously removed from the possession of The Owl Drug Co. sometime between the evening of April 21, 1961, and the morning of April 24, 1961." Defendant at pretrial contended that "Defendant was not required to endorse or deliver to plaintiffs the aforesaid Notes" and thereafter insisted upon this contention.

Owl continued to hold the securities which plaintiffs had delivered with their $169,370 note, and Owl wrote Sam's creditors that he owed it $250,000 and that it was looking to the notes as security for the same. Pursuant to demand of defendant, Title Insurance and Trust Company, as trustee, commenced foreclosure through public sale of "the real property deeded to it as security for said note" of $169,370, which said foreclosure proceeding was under way at the time of commencement of the instant action on October 6, 1961.

On August 26, 1961, two of the drug store operating corporations made assignments for the benefit of creditors, and defendant *on August 30th,* four days later, *asserted for the first time that it could not deliver the notes because they had been stolen.*

The court found, in response to defendant's request for special findings, that "on Friday, April 21, 1961, the six (6) promissory notes, which were the subject of said March 1, 1961 contract, were not locked in a safe at The Owl Drug Co. . . . That said notes were not stolen from The Owl Drug Co."

Plaintiffs on September 8, 1961, gave notice of rescission; defendant on September 13 notified plaintiffs it would not restore the consideration it had received and this action was then filed. As above indicated it resulted in a judgment favorable to plaintiffs.

Appellant's principal contention is that the court erred prejudicially in receiving parol evidence as an aid to solving the question whether defendant was obligated to deliver to plaintiffs the six notes duly endorsed without recourse. Its counsel have relied upon the language of paragraph 1 of the agreement—"OWL hereby agrees to sell, transfer and assign . . . to the PURCHASERS, those certain six (6) promissory notes"—and studiously ignore that of paragraph 10 providing for a meeting of the parties "for the purpose of the delivery by OWL to PURCHASERS of the NOTES, together with such additional instruments as may be appropriate or necessary. . . ." The whole point is that paragraph 1 does not contain the word "deliver" which appears in paragraph 10.

Appellant says that the instrument is free from ambiguity and is to be interpreted without extrinsic aid. We are inclined to agree, but we find the contract to be clearly to the effect that the notes should be delivered to plaintiffs. The result is the same whether the instrument be construed with or without the aid of extrinsic evidence. In either event the contract expresses an obligation resting upon Owl to deliver the notes. If, perchance, there was error in receiving the extrinsic evidence it was innocuous.

The receipt of parol evidence could not be held prejudicial or erroneous in this case, for no objection was made to it at the time it was offered.[5] The former view that the parol evidence rule was one of substantive law, requiring no

[5]The objection shown in the following quotation from the reporter's transcript does not suffice to raise the point:

"Q. Counsel has read to you from the initial draft or one draft to the agreement which has been received in evidence as Defendant's Exhibit B, and I direct your attention to that portion which was read by her, appearing on page 7, subparagraph (a) of paragraph 10, wherein it states that Owl will deliver to the purchasers the notes, and the 'notes' being capitalized in capital letters. Was there ever any doubt in your mind that you were to receive the actual notes? A. Sure. MRS. BARTON: I am going to object as calling for a conclusion of the

objection to be voiced at the trial, has been abrogated in this state through the decision in *Pao Ch'en Lee* v. *Gregoriou*, 50 Cal.2d 502, 506 [326 P.2d 135], wherein it is said: "[T]he admission of parol evidence to vary or add to a written instrument cannot be objected to for the first time in the appellate court [citations]. Any statements in *Lifton* v. *Harshman*, 80 Cal.App.2d 422 [182 P.2d 222], to the contrary are disapproved." The reference to the *Lifton* opinion undoubtedly points to the following at page 432 of 80 Cal. App.2d: "The parol evidence rule is not a rule of evidence, but is one of substantive law. [Citations.] Such evidence, though admitted without objection, must be ignored as of no legal import and its incompetency to vary a written contract is a matter of law."

The parol evidence was conflicting; the trial judge resolved the dispute in favor of plaintiffs, finding to be true the allegation of the complaint that defendant agreed to "sell, assign, deliver and transfer to the plaintiffs" the six notes. In that connection it is interesting to note that a draft of the contract dated February 1961 and introduced in evidence by defendant, uses in paragraph 1 the same words as the final form—"agrees to sell, transfer and assign," while paragraph 10 (a) says: "OWL will deliver to the PURCHASERS the NOTES, together with appropriate instruments assigning and transferring any and all interest of OWL on such date in the NOTES to the PURCHASERS in conformity with the terms, provisions and disclaimers of liability set forth in this Agreement." This expression of an obligation to make delivery of the notes was carried into paragraph 10 of the final agreement in different form but with no change in meaning. In fact, these words appear in handwriting in the typed copy of the agreement attached to the complaint and the court found it to be "a true and correct copy of the written contract." Thus the parties disclosed a continuing intent that the notes be delivered to plaintiffs as an incident to their purchase of same.

The parol evidence also shows that Sam Calabrese was in financial difficulty with his insistent creditor, Owl Drug Co., that he agreed to have his sons and other relatives buy the six notes at par through giving their secured note as con-

---

witness as to what the final agreement actually included. THE COURT: No, I will overrule the objection. Q. BY MR. NIELSON: Were you to receive the actual notes, Mr. Calabrese? A. Yes, sir."

sideration; that the primary object in their buying the six notes was to release the property of Sam and his corporations from the lien in favor of Owl and to substitute liens upon property of the relatives and thus enable Sam and his corporations to obtain a new loan or loans or to arrange with creditors to subordinate the claims of the six notes to the claims of other creditors of the makers of the notes, and that all of this was thwarted through plaintiffs' inability to obtain physical possession of the paper.[6]

Of course, a contract may be rescinded "2. If, through the fault of the party as to whom he rescinds, the consideration for his obligation fails, in whole or in part; . . . 4. If such consideration, before it is rendered to him, fails in a material respect, for any cause" (quoting Civ. Code, § 1689, as it existed at the time of the notice of rescission).

■ This matter of materiality of the failure poses a question of fact (*Mills* v. *Richmond Co., Inc.*, 63 Cal.App. 594, 596 [219 P. 465]), which the trial judge resolved against defendant.

■ We think it clear that the agreement when read without the aid of extrinsic evidence requires the defendant to endorse and deliver the notes to plaintiffs. ■ We also think it clear from the parol evidence that there could have been no good reason for withholding the notes from plaintiffs except the desire to embarrass and defeat their efforts at financial resuscitation. Such conduct was in violation of an implied covenant of the contract, for "[i]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 771 [128 P.2d 665].)

---

[6]The court found: "That persons, firms and corporations applied to by the plaintiffs for a loan or loans and by Samuel Ray Calabrese and by Cal-Cam of California and by Calabrese of California and by Cambrese, Inc. and by Vanca, Inc. refused to make loans for the reason that the plaintiffs were not in physical possession of the six (6) promissory notes which were the subject of the written contract dated March 1, 1961, between the plaintiffs and the defendant, The Owl Drug Co. . . .

"That persons, firms and corporations and groups of creditors, applied to by the plaintiffs and Samuel Ray Calabrese, Cal-Cam of California, Cambrese, Inc., Vanca, Inc., and Calabrese of California, for the extension of time for the payment of obligations, refused to grant such extension for the reason that the plaintiffs were not in physical possession of the six (6) promissory notes which were the subject of the written contract dated March 1, 1961 between the plaintiffs and the defendant, The Owl Drug Co."

■ While paragraph 1 of the agreement does not use the word "deliver" it carries that connotation. Civil Code, § 1655: "Stipulations which are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention." ■ These were negotiable notes (Civ. Code, § 3265; 8 Cal.Jur.2d § 15, p. 347), payable to order. The transfer to another constitutes negotiation (Civ. Code, § 3111), and where, as here, the note is payable to order "it is negotiated by the indorsement of the holder completed by delivery." (*Id.*)

■ *Harber* v. *Lincoln*, 175 Okla. 221 [51 P.2d 967] (syllabus by the court): "2. Delivery of a negotiable instrument is an essential, integral part of the transaction of negotiation of such instrument; i.e., delivery is essential to a complete legal transfer of ownership thereof."

10 Corpus Juris Secundum section 202, page 689: "Delivery of a negotiable instrument is generally essential to its complete legal transfer. Negotiable Instruments Act § 30 provides that if an instrument is payable to order it is negotiated by the indorsement of the holder completed by delivery. Delivery of the instrument forms part of the contract of indorsement, as well as of transfer by assignment, and it is essential in general to its complete legal transfer. It is not necessary, however, that indorsement and delivery should be simultaneous, although the transfer will take effect only after indorsement and delivery. . . ." *Id.*, section 210, page 696: "An agreement to transfer a note is prima facie an agreement for its transfer by indorsement, but such an agreement does not of itself amount to a transfer of the legal title."

Moreover, section 3130, Civil Code, provides: "Where the holder of an instrument payable to his order transfers it for value without indorsing it, the transfer vests in the transferee such title as the transferor had therein, *and the transferee acquires, in addition, the right to have the indorsement of the transferor.* But for the purpose of determining whether the transferee is a holder in due course, the negotiation takes effect as of time when the indorsement is actually made." (Italics added.)

See also, 87 American Law Reports at page 1179.

■ Without any doubt the contracting parties intended and expressed their intention that the six notes be delivered to plaintiffs, the buyers, and the law imposed that duty upon them in the absence of a clear expression of a contrary

intention. Indeed, defendant's vice president Clemenson testified: "It was our intention to hand them the notes when the securities had been checked out and completely verified that the amount being put up was that value. Q. Yes, but you intended ultimately to deliver them and hand them over to them when that had been done, didn't you? A. Yes."

Ordinarily an indorsement without recourse (a qualified indorsement) implies certain warranties specified in section 3146, Civil Code. "Each person who negotiates an instrument by delivery or by a qualified indorsement warrants that the instrument is genuine and in all respects what it purports to be; that he has a good title to it; that all prior parties had capacity to contract; and that he has no knowledge of any fact which would impair the validity of the instrument or render it valueless." (8 Cal.Jur.2d § 98, p. 425.) But such warranties are not implied in the indorsement where made pursuant to an agreement which provides otherwise. (*Eisenman* v. *Vernell* (Fla.) 114 So.2d 16, 17-18; *In re Canal Bank & Trust Co.*, 221 La. 184 [59 So.2d 115, 118]; *General Contract Purchase Corp.* v. *Alcorn*, 226 Mo. App. 1026 [47 S.W.2d 162, 163-164]; *Carroll* v. *Nodine*, 41 Ore. 412 [69 P. 51, 93 Am.St.Rep. 743]; *Davis* v. *Brown*, 94 U.S. 423, 427 [24 L.Ed. 204]; *Title Ins. & T. Co.* v. *Bandini Estate Co.*, 26 Cal.App.2d 157, 162 [79 P.2d 141]; *Home State Bank of Russell, Kan.* v. *Milberger*, 146 Kan. 541 [72 P.2d 1004]; 10 C.J.S. § 237, p. 730.) That is the case before us.

Appellant argues, however, that it was impossible for it to make delivery because the notes were stolen on or within three days after April 21, 1961, which was the day of completion of delivery to defendant of consideration due from plaintiffs. The answer contains no such defense. "Impossibility of performance is a defense and the burden of proof in establishing it rests on defendant." (*Oosten* v. *Hay Haulers etc. Union*, 45 Cal.2d 784, 788 [291 P.2d 17].)

Assuming that the issue was properly raised at pretrial and the pleading thus indirectly amended, there was no evidence upon the subject of the alleged theft of the notes except that of defendant's witnesses whom the trial judge disbelieved, as he had a right to do (*Nevarov* v. *Caldwell*, 161 Cal.App.2d 762, 777 [327 P.2d 111]; *La Jolla Casa de Manana* v. *Hopkins*, 98 Cal.App.2d 339, 345-346 [219 P.2d 871]; *People* v. *Matlock*, 51 Cal.2d 682, 695 [336 P.2d 505, 71 A.L.R.2d 605]), and hence he was required to find against

defendant, the party having the burden of proof; he did find "[t]hat said notes were not stolen from The Owl Drug Co." and that there was a wrongful refusal and failure to deliver same. "Where no evidence, or insufficient evidence, is introduced on an issue, the finding on that issue should be against the party who has the burden of proof. A finding in his favor thereon cannot stand." (48 Cal.Jur.2d § 290, p. 292.)

 We hold that defendant was obligated to indorse without recourse and deliver to plaintiffs the six notes; that refusal and failure so to do worked failure of consideration for the March 1, 1961, agreement in a material respect and afforded plaintiffs ground for rescission.

 Appellant argues, however, that plaintiffs waived their right to rescind, if one they had. Waiver is an affirmative defense which must be alleged as such (*Calhoun* v. *Davis*, 121 Cal.App.2d 167, 172 [262 P.2d 620]), and cannot be raised for the first time on appeal (*Wood* v. *Jotham Bixby Co.*, 29 Cal.App.2d 294, 299 [84 P.2d 204]). Respondents say: "The pretrial order did not raise the question." However, it does incorporate the joint pretrial statement of counsel which says that defendant Owl contended that one of the issues of law was: "5. Whether plaintiffs waived the right to rescind." We do not pause to consider whether such assertion of a new issue at pretrial, without express recognition by the court that it is an existing issue, operates to amend the parties' pleading and make it an issue to be canvassed by the trial court. Though the trial judge made no express finding on the subject of waiver and was not requested so to do in defendants' "Objections to Proposed Findings of Fact and Conclusions of Law and Request for Special Findings," he did find to be untrue the claimed essential facts upon which appellant relies to establish a waiver. Appellant advances no claim of error in failing to make a finding on the subject. The argument falls for lack of sufficient foundation.

Other points debated by counsel in their briefs, such as business frustration, require no separate discussion. They have been examined and the matters hereinbefore set forth fully dispose of the case.

Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.