FEDERAL DEPOSIT INSURANCE CORPORATION, as a receiver of United States National Bank, Plaintiff-Appellant,

v.

AIR FLORIDA SYSTEM, INC., a Delaware Corporation, Defendant-Appellee.

AIR FLORIDA SYSTEM, INC., Counter-Claimant,

v.

FEDERAL DEPOSIT INSURANCE CORP., Counter-Defendant.

FEDERAL DEPOSIT INSURANCE CORPORATION, as a receiver of United States National Bank, Plaintiff-Appellant,

v.

AIR FLORIDA SYSTEM, INC., a Delaware Corporation, et al., Defendants-Appellees.

Nos. 84–6280, 85–6327.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 1986.

Decided July 17, 1987.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 22, 1987.

Elliot L. Bien, San Francisco, Cal., and E. Whitney Drake, Washington, D.C., for plaintiffs-appellants.

Ralph Zarefsky, Los Angeles, Cal., and Patrick C. Shea, San Diego, Cal., for defendants-appellees.

Before GOODWIN, TANG and FLETCHER, Circuit Judges.

FLETCHER, Circuit Judge.

The FDIC appeals a judgment refusing to rescind its contract with Air Florida and enforcing an arbitration award in Air Florida's favor. We reverse in part, vacate in part, and remand.

## BACKGROUND

In its capacity as receiver of the United States National Bank, the FDIC became a major creditor of the Westgate-California Corporation ("Westgate"). As such, the FDIC was entitled to a large block of Westgate stock once Westgate's reorganization in bankruptcy was completed. In 1980, the FDIC sold its Westgate interests to Air Florida for $15.4 million. As part of the agreement, Air Florida promised to make a general public offer for outstanding Westgate common shares at no less than the price it paid the FDIC. If Air Florida acquired more than 80% of Westgate's common stock, and if it paid more per share to tender-offerees than the FDIC received, the FDIC was entitled to additional compensation to afford it the same price per share paid the tender-offerees.

Air Florida purchased the Westgate stock in order to acquire Air California, a Westgate controlled corporation. After Air Florida purchased the FDIC's interest in Westgate, however, Westgate's bankruptcy trustees arranged, and the district court approved, the sale of Air California to a third party for $61.5 million. The sale caused a substantial increase in the trading price of outstanding shares of Westgate common stock. Air Florida had paid approximately $18 per share for the stock, but after Air California's sale, Westgate shares traded between $21 and $26.50 per share.

In February 1982, Air Florida informed the FDIC that it had decided not to make a tender offer. On April 1, 1982, Westgate's directors announced that Westgate would be liquidated with shareholders receiving $28.25 per share of common stock.[1] On April 30, the FDIC brought suit against Air Florida seeking rescission and restitution because Air Florida had failed to make the tender offer. In defense, Air Florida denied that it had a contractual duty to make an offer at a price exceeding the price paid to the FDIC and argued that the rise in Westgate's market price excused its tender offer obligation. The FDIC asserted that Air Florida was required to make an offer reasonably calculated to acquire the shares, no matter what the market price.

Air Florida counterclaimed for $2 million it alleged was owing under a separate provision in the contract that required adjustment of the purchase price of the stock upon sale of a cannery owned by Westgate. After a bench trial, the district court adopted Air Florida's interpretation of the contract, holding that Air Florida had not breached its agreement with FDIC. *FDIC v. Air Florida Sys., Inc.*, No. 85–0525–N(H) (S.D.Cal. Jan. 6, 1983) (Findings of Fact and Conclusions of Law). Having rejected the FDIC's rescission claim, the district court held that the contract, including the cannery adjustment provision, remained in effect. The amount of the adjustment was left open until "determined by the parties, the parties' designated accountants or an independent accountant

---

1. The liquidating dividend was paid on May 3, 1982. Air Florida realized a gain of more than $10 per share over the price paid to the FDIC, a $3.86 million profit on its Westgate common shares.

pursuant to the arbitration procedures set forth in ... the [purchase] Agreement." *Id.* at 9.

When neither the parties nor their accountants could reach an agreement on the cannery adjustment, the contractual arbitration process was invoked. Following the arbitration, which resulted in a $1,486,000 adjustment in favor of Air Florida, the FDIC moved to vacate the award because of the arbitrator's failure to hold an oral hearing. The district court held that "the arbitrator's election to resolve the question ... based on written submissions alone, did not deny the FDIC a fundamentally fair hearing." *FDIC v. Air Florida,* No. 82–0525–N(I) (C.D.Cal. July 10 1984) (unpublished order). The court granted Air Florida's cross-motion to enter the arbitration award as part of the judgment and allowed prejudgment interest on the award.

## DISCUSSION

### 1. *The Tender Offer*[2]

*The Written Agreement*

Air Florida's obligation to make a tender offer is governed by the Purchase and Sale Agreement (the Agreement) comprised of a November 14, 1980 agreement (November Agreement), and an earlier agreement entered into on October 27, 1980 (October Agreement) incorporated by reference into the Agreement.[3] Paragraph 6.01 of the October Agreement provides:

Air Florida, at its own expense, agrees to make a general public offer to the holders of the Common Stock of [Westgate] to acquire the shares of Common Stock owned by such holders ('Shareholders') no later than 425 days after the date of Consummation ('Offer').

Conditions precedent to Air Florida's duty to make the tender offer are set out in paragraph 6.04 of the October Agreement:

The obligation of Air Florida to make the Offer shall be subject to (i) compliance with all applicable laws and regulations regulating tender or exchange offers and any other applicable laws and regulations; (ii) Consummation [of the Westgate reorganization]; and (iii) completion of the transfer [of title to the FDIC securities to Air Florida].

Under paragraph 6.03 of the October Agreement, "[t]he minimum price for a share of Common Stock pursuant to the Offer" was to be the price actually paid by Air Florida to the FDIC.

Paragraph 12 of the November Agreement, *"Right to Benefits of Tender Offer,"* in part provides:

[Air Florida] has agreed to make an offer to all the holders of the Common Stock of [Westgate] ("Offer"). If [Air Florida] is successful in acquiring 80% of the Common Stock ... of [Westgate] pursuant to the Offer, this Agreement and as a result of any previously acquired Common Stock, then FDIC shall have the option to obtain an equivalent amount of consideration which [Air Florida] offers for each share of Common Stock of [Westgate] pursuant to the Offer.

The FDIC argues that Air Florida had an obligation to make a bona fide tender offer at a price adequate to attract offerees subject only to the conditions of paragraph 6.04 of the October Agreement, all of which were satisfied. Air Florida asserts that its only duty was to make the tender offer at the price that it paid the FDIC. Air Florida argues that the sole purpose of the tender offer provision was to protect the FDIC from shareholder lawsuits that might allege that the FDIC had improperly exacted a premium for its block of stock. According to Air Florida, the provision was simply to ensure that other shareholders got at least as much as the FDIC.

**2.** The meaning of a contractual term and the determination whether such a term is ambiguous are both questions of law subject to de novo review. *United States v. City of Twin Falls,* 806 F.2d 862, 869 (9th Cir. 1986). If ambiguity exists and the district court makes factual findings as to the parties' intent, the court's findings will not be disturbed unless clearly erroneous. *Id.* Here, because we find no ambiguity, *see infra* at 838, our review is de novo.

**3.** We refer to the "October Agreement" and the "November Agreement" only to facilitate citation to particular clauses. Together, the two documents constitute the Agreement.

Paragraph 15.4 of the October Agreement states that the "Agreement shall be construed, governed and enforced in accordance with the laws of the State of California." Under California law, the paramount principle informing contract interpretation is to give effect to the intention of the parties. *Healy Tibbitts Constr. Co. v. Employers' Surplus Lines Ins. Co.*, 72 Cal.App.3d 741, 140 Cal.Rptr. 375, 379 (1977). The court should ascertain the intention of the parties from the writing alone, if possible. Cal.Civ.Code § 1638; *Healy Tibbitts Constr. Co.*, 140 Cal.Rptr. at 379. The words are to be understood in their ordinary sense unless a special meaning is given by usage. Cal.Civ.Code § 1644.

A straightforward reading of the Agreement requires that we find that Air Florida had a duty to make a "tender offer" within 425 days of consummation.[4] The district court's findings are in accord, but it found that the duty was limited to an offer at the "minimum price" defined in the contract as the price per share paid to the FDIC. Because Westgate stock always traded above the minimum price during the 425 day period, an offer at the minimum price would have been a futile act. Accordingly, the district court held that Air Florida's obligation was excused.

The district court misread the Agreement when it concluded that Air Florida's duty was limited to a tender offer at the minimum price.[5] A tender offer has certain characteristics that set it apart from other market transactions. We have previously articulated some of those characteristics:

(1) active and widespread solicitation of public shareholders for the shares of an issuer; (2) *solicitation made for a substantial percentage of the issuer's stock;* (3) *offer to purchase made at a premium over the prevailing market price;* (4) terms of the offer are firm rather than negotiable; (5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased; (6) offer open only a limited period of time; (7) offeree subjected to pressure to sell his stock.

*Polinsky v. MCA, Inc.*, 680 F.2d 1286, 1291 (9th Cir.1982) (quoting *Wellman v. Dickinson*, 475 F.Supp 783, 823–24 (S.D.N.Y. 1979)) (emphasis added). In other words, a "tender offer" is made in aid of a bona fide attempt to acquire control of a company. At the very least, it is an offer reasonably calculated to persuade shareholders to sell their stock. Air Florida's interpretation differs from the ordinary meaning of the term "tender offer." An offer of only the minimum price, in the face of a higher market price, in our view would not be a bona fide tender offer.

Furthermore, the bargain price that Air Florida paid the FDIC for the Westgate stock supports the conclusion that the parties contemplated that the tender offer price might be higher than the price paid to the FDIC. Air Florida agreed to pay $15.4 million for stock with an estimated value in excess of $17 million. Air Florida's promise to make a tender offer served as partial consideration. The FDIC took the risk that it would get nothing more if the price of Westgate shares declined or remained the same, but it contracted for additional com-

---

**4.** The Agreement uses the term "general public offer" and "tender offer" interchangeably. *See* October Agreement ¶ 6.01 ("Air Florida agrees to make a general public offer"); November Agreement ¶ 12 (entitled *"Rights to Benefits of Tender Offer"*).

**5.** Air Florida also agreed to make an offer for Westgate preferred stock. That agreement was limited to the price that Air Florida paid the FDIC for its preferred stock. Paragraph 14 of the November Agreement provides:

Subject to the provisions of Section 6.04, [*see supra* at 836,] Air Florida agrees to make a general public offer to the holders of the Class A Preferred Stock of [Westgate] to acquire the shares of Preferred Stock owned by such

holders ("Holders") no later than 425 days after the date of Consummation ("Offer") on the same terms and conditions, and for the same price, as paid to FDIC for its Preferred Stock.

Of course, this commitment ran to shareholders other than FDIC. Unlike paragraph 14, the provisions dealing with the offer for common stock do not state that the offer shall be at a particular price, but rather that it shall *not be below* a particular price. *See supra* at 836 (¶¶ 6.01 & 6.03). The difference between Air Florida's obligations with respect to the common stock and the preferred stock supports FDIC's interpretation of the contract.

pensation if the price went up. Air Florida's interpretation would render its promise illusory and give it a windfall at the FDIC's expense.

Air Florida contends that certain provisions of the Agreement belie a finding that it was required to make a bona fide tender offer for the FDIC's benefit. First, it cites paragraph 6.02, which states that "[t]he Offer, at the option of Air Florida, may ... contain such terms and conditions as are generally customary in tender or exchange offers, as the case may be." This paragraph, as we read it, simply leaves the peripheral terms of the offer to the discretion of Air Florida but does not speak to price and does nothing to diminish Air Florida's obligation to make the offer required by other sections of the Agreement.

Second, Air Florida attaches significance to the fact that it had the option of adjusting the tender offer price downward, under paragraph 6.03, if Westgate's cannery had not been sold at the time of the offer, in order to "adjust for an estimated Cannery Adjustment." However, this provision simply recognizes that the *minimum* offer price was not fixed when the agreement was signed because the price Air Florida was to pay to the FDIC, was subject to the cannery adjustment. *See supra* at 835. The uncertainty as to the minimum price does not support an argument that the minimum price was the only price at which Air Florida was required to make its offer.

Finally, Air Florida claims that paragraph 13 of the November Agreement entitled *"Third Party Beneficiary,"* which states that the tender offer provisions "are for the benefit of the proposed tender offerees," is an explicit statement that the offer was *not* intended to benefit the FDIC. We disagree. Creating legal rights under the contract for persons who would otherwise not have such rights does not diminish the rights of the parties to the contract. Paragraph 13 replaced paragraph 6.05 of the October agreement, under which there were *no* rights for third-parties; it does not derogate from Air Florida's obligations to the FDIC.

We conclude that the plain language of the Agreement imposed a duty on Air Florida to make a tender offer at a price reasonably calculated to obtain outstanding shares of Westgate. Nothing in the contract supports Air Florida's contention that the minimum price that it was required to offer was also the maximum price.

*Extrinsic Evidence*

Air Florida would have us look to the circumstances surrounding the sale of the FDIC's interest in Westgate to support its interpretation of the contract. Even were we to assume that Air Florida's extrinsic evidence is admissible because it "is relevant to prove a meaning to which the language of the [Agreement] is reasonably susceptible," *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 564, 442 P.2d 641, 644 (1968), the proffered evidence does nothing to contradict the plain meaning of the agreement or render it ambiguous.

First, Air Florida points to the resolution of the FDIC's Board of Directors approving the sale to Air Florida. It states that the FDIC "is hereby authorized to sell its interest in [Westgate] ... for the total consideration of approximately $15,432,-000," without mentioning the possibility of additional compensation flowing from the tender offer. The resolution, however, contained at most only a cursory summary of the proposed Agreement, without any reference to the contingencies contained in the Agreement. The resolution does not mention the anticipated cannery adjustment or the fact that additional compensation would be due if a successful tender offer at over $18 per share were made. Simply put, all contract provisions that could affect the price were not incorporated in the FDIC board resolution approving the sale of Westgate. Thus, the omission of reference to the tender offer in the resolution is not helpful one way or the other in determining the parties' intent.

Second, Air Florida asserts that a letter from the FDIC's counsel to the attorney representing Westgate shareholders dem-

onstrates that the FDIC understood Air Florida's obligation to require a tender offer only at the minimum price. The relevant part of the letter states: "In our telephone conversation, we also discussed the fact that the final price of the tender offer may be subject to adjustment. We specifically discussed a potential cannery adjustment.... I can give you no additional enlightenment on what price ... will be realized for the cannery." The letter makes no mention of an adjustment necessitated by increases in the price of Westgate stock. It appears, however, that the FDIC's counsel was responding to an expressed concern that the final price might be decreased based on the cannery adjustment; he was not otherwise addressing the terms of the Agreement.

Third, Air Florida claims that various filings it made with the Securities and Exchange Commission demonstrate that its commitment was at the minimum price. Air Florida cites the schedule 13D filed the day after the October Agreement was executed. This document, however, supports FDIC's position. In relevant part, the Schedule 13D states: "The minimum price pursuant to the tender or exchange offer must be at least equivalent to the final price per share of Common Stock paid to the FDIC." It does not say "the price," it says "the minimum price" and clearly contemplates the possibility of a higher price. Air Florida also points to its Schedule 14D–1 (tender offer statement). This document estimates that the purchase price per share of Westgate common stock will be $18. However, the 14D–1's estimate was accurate when filed because current market price was well below $18 per share. The 14D–1 also states that "[s]ignificant contingencies exist with respect to the final purchase price...." Moreover, the section of the 14D–1 that describes Air Florida's contractual obligations tracks the language used in the Agreement. It states: "Air Florida has agreed that the minimum price

offered pursuant to such tender and exchange offer must be at least equivalent to the final price per share ... paid by Air Florida to the FDIC...." Thus, we find no support for Air Florida's interpretation of the agreement in its SEC filings.

Finally, Air Florida claims that the decision of Westgate's trustee to sell Air California and the FDIC's objections to the sale support its interpretation of the agreement. The trustee, in determining whether to make the sale, compared the value to Westgate's creditors of Air Florida's tender offer with that of the purchase offer made by the successful buyer, Air California Investments. The trustee considered the value per share of the tender offer to be the price paid to the FDIC—that is, the minimum price provided for in the Agreement. This is understandable since the calculation was made at a time when stock in the reorganized Westgate had not yet been issued and the only reasonably firm figure available to the trustee was the minimum price. For the same reason, the FDIC's objections filed to the sale of Air California do not contain an argument that the value of Air Florida's tender offer had been understated. We doubt that a court comparing a firm cash offer to the potential rise in price of unissued stock would rely on that potential to reject the sale. Thus, the FDIC's failure to make such an argument cannot be taken as proof that it understood the minimum price to be the only price Air Florida was obligated to offer.

In sum, we find nothing in Air Florida's proffered extrinsic evidence [6] that contradicts the plain meaning of the Agreement. Air Florida had a duty to make a tender offer at a price reasonably calculated to induce shareholders to tender their shares. Air Florida's failure to make such an offer breached its Agreement with the FDIC.

*The Remedy*

The FDIC claims that Air Florida's failure to make the agreed-upon tender offer constituted a failure of consideration enti-

---

**6.** Air Florida presents its extrinsic evidence by way of a selective chronological statement of facts and events surrounding the making of the Agreement with the FDIC. That we may not have specifically addressed every element in that chronology does not mean that we have not considered every element.

tling the FDIC to rescind the Agreement.[7] The remedy the FDIC requests is at least a partial restitution of Air Florida's profits and a discharge from its obligation to pay Air Florida the money owing for the cannery adjustment. In support of its right to rescind, the FDIC relies on California Civil Code Section 1689, which, in relevant part, provides:

(b) A party to a contract may rescind the contract in the following cases:

\* \* \* \* \* \*

(2) If the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds.

\* \* \* \* \* \*

(4) If the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause.

▮▮▮ Air Florida's refusal to perform its tender-offer obligation constitutes a failure of consideration. *See Taliaferro v. Davis,* 216 Cal.App.2d 398, 31 Cal.Rptr. 164, 172 (1963). Although Air Florida paid the FDIC over fifteen million dollars in consideration, "[t]he right to rescind for a partial failure of consideration may be exercised although there has been a partial performance by the party against whom the right is exercised." *Coleman v. Mora,* 263 Cal.App.2d 137, 69 Cal.Rptr. 166, 173 (1968). However, a partial failure of consideration justifies rescission only if the failure is " 'material,' or go[es] to the 'essence' of the contract." *Wyler v. Feuer,* 85 Cal.App.3d 392, 149 Cal.Rptr. 626, 633 (1978); *see also Pennel v. Pond Union School Dist.,* 29 Cal.App.3d 832, 105 Cal. Rptr. 817, 821 (1973) (breach must be material); *Taliaferro,* 31 Cal.Rptr. at 172 (failure to perform must constitute a breach in an "essential particular"). *But see Crofoot*

*Lumber v. Thompson,* 163 Cal.App.2d 324, 329 P.2d 302, 308 (1958) (indicating that breach must go to the "essence" of the contract only if there has been no repudiation). Thus, the right to rescind a particular contract "depends upon the gravity of the breach" relied on to justify the rescission. *Crofoot Lumber,* 329 P.2d at 308, *quoted in Taliaferro,* 31 Cal.Rptr. at 172.

Whether a breach constitutes a failure of consideration sufficient to be deemed material and thus to warrant rescission of a contract is a question of fact properly determined by the trial court. *Calabrese v. Rexall Drug & Chem. Co.,* 218 Cal.App.2d 774, 32 Cal.Rptr. 665, 670 (1963). *Cf. Bonadelle Constr. Co. v. Hernandez,* 169 Cal. App.2d 396, 337 P.2d 85, 87 (1959) (substantial performance is a question to be determined case-by-case, based on the particular facts and circumstances). In the instant case, because the district court concluded that there had been no breach of the Agreement, it found that there had been no material failure of consideration and accordingly that the FDIC was not entitled to rescind the agreement. Because we find a breach, we remand to the district court to determine whether the breach was material.

If the district court finds that Air Florida's failure to make the tender offer constituted a material breach, the FDIC is entitled to rescind, thus extinguishing the Agreement.[8] Cal.Civ.Code § 1688. If rescission of the Agreement is warranted, the FDIC's further obligations under the contract—in particular, those relating to the cannery adjustment—are discharged, and it may be entitled to a restitutionary remedy. *Crofoot Lumber,* 329 P.2d at 308 (quoting Corbin on Contracts § 1104). California Civil Code section 1692, entitled "Relief Based on Rescission," states that "[t]he

---

7. In its First Amended Complaint, the FDIC also claimed that it was entitled to rescind based on California Corporations Code § 25401 (untrue statements and omissions) as well as on section 10b of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.- 10b–5, (false statements). The FDIC does not appeal from the district court's denial of these claims.

8. Air Florida is entitled to raise the several affirmative defenses that the district court declined to pass on earlier.

aggrieved party shall be awarded complete relief, including restitution of benefits, if any, conferred by him as a result of the transaction and any consequential damages to which he is entitled...." Under section 1692, the court may also require the rescinding party "to make any compensation to the other which justice may require and may otherwise in its judgment adjust the equities between the parties."

■ If, on the other hand, the district court determines that the Agreement cannot be rescinded, it nevertheless "may grant any party to the action any other relief to which he may be entitled under the circumstances." Cal.Civ.Code § 1692. In other words, a breach insufficiently material to form the basis for rescission may entitle the aggrieved party to a restitutionary remedy or damages. Clearly Air Florida's breach entitles FDIC to either an equitable restitutionary remedy or a legal damages remedy. The appropriate remedy and its scope are matters properly to be determined by the district court on remand.

### 2. The Cannery Adjustment

The FDIC challenges the cannery adjustment arbitration award entered in favor of Air Florida, first, on the ground that its performance has been excused, and, second, on the ground that it was entitled to, and did not receive, an oral hearing before the arbitrator. The FDIC also claims that the district court erred in granting prejudgment interest on the award.

#### Excuse of Performance

If the district court determines that the FDIC can rescind the Agreement, the FDIC is relieved of its obligation to make further payments pursuant to the cannery adjustment, and the legality of the arbitration procedures will be moot. If, on the other hand, Air Florida's breach was not material, FDIC's obligation to provide additional consideration pursuant to the cannery adjustment would be excused only if that obligation was dependent upon Air Florida's obligation to make a tender offer. *Verdier v. Verdier*, 133 Cal.App.2d 325, 284 P.2d 94, 100 (1955) (holding that if

"covenants are independent, breach of one does not excuse the performance of the other"). The California courts indulge a strong presumption, however, against construing contractual obligations as dependent:

> To construe covenants as dependent is to work a forfeiture as to one party, and no obligation of a contract is to be regarded as a condition precedent unless made so by express terms or necessary implication. Where a breach is partial and is "capable of being fully compensated," the strong tendency is to regard it as insufficient to constitute a defense.

*Id.* (quoting *Redpath v. Evening Express Co.*, 4 Cal.App. 361, 88 P. 287, 289 (Cal. App.1906)); *see Rubin v. Fuchs*, 1 Cal.3d 50, 81 Cal.Rptr. 373, 459 P.2d 925, 928 (1969).

■ The Agreement does not say that the tender offer was a condition precedent to the cannery adjustment. Nor do we find a "necessary implication" that the obligations were dependent. Because it was entirely possible that the FDIC's obligation to provide further compensation under the cannery adjustment provision could have matured before the period in which Air Florida was required to make its tender offer, the tender offer could not be a condition precedent to the cannery adjustment. Thus, if the Agreement is not rescinded, FDIC's obligation to compensate Air Florida for the cannery adjustment has not been discharged.

#### Right to an Oral Hearing

FDIC asserts that the arbitrator's refusal to hold an oral hearing on the issue of contractual intent violated its rights and rendered the arbitration unenforceable. The arbitrator, who was an accountant, did meet with the FDIC and Air Florida accountants, but he then refused the FDIC's request to hold a further evidentiary hearing. Rather, he requested the parties to submit in written form the materials they wished to have considered. In support of its interpretation of the cannery adjust-

ment provision, FDIC submitted the affidavit of the attorney who negotiated the Agreement for the FDIC. The FDIC concedes that it could have submitted additional written documentation had it chosen to do so.

There is no disagreement that the federal Arbitration Act, 9 U.S.C. §§ 1–14 governs this dispute. Where the Act applies, it "provides the exclusive grounds for challenging an arbitration award within its purview." *Lafarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1338 (9th Cir.1986). Section 10 of the Act sets forth the circumstances under which a district court may vacate an arbitration award. 9 U.S.C. § 10. The FDIC relies on section 10(c) to support its claim of procedural deficiency. Section 10(c) permits vacation of an award

> [w]here the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

9 U.S.C. § 10(c).

■■■ While section 10(c) assumes that the parties to an arbitration will be afforded a hearing, neither in this section nor anywhere else in the Act are hearing procedures, much less oral hearing procedures, explicitly provided for. Certainly the parties may agree upon appropriate procedures by contract, but, where they do not, procedural matters "become part of the bundle of issues committed to decisions by the arbitrator." *Sheet Metal Workers Int'l Ass'n, Local 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 744 (9th Cir. 1985). An arbitration award should not be vacated on procedural grounds unless the procedure employed was a "sham, substantially inadequate or substantially unavailable." *Harris v. Chemical Leaman Tank*

*Lines*, 437 F.2d 167, 171 (5th Cir.1971), *quoted in Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1296 (9th Cir.), *cert. denied*, 459 U.S. 990, 103 S.Ct. 346, 74 L.Ed.2d 386 (1982). So long as the hearing provided is "full and fair," a procedural attack must fail. *Coast Trading Co. v. Pacific Molasses Co.*, 681 F.2d 1195, 1198 (9th Cir.1982). Applying section 10(c), a hearing is full and fair unless the arbitrator (1) despite a showing of cause, refuses a postponement; (2) refuses to hear pertinent and material evidence; or (3) engages in misbehavior that prejudices the rights of a party. 9 U.S.C. § 10(c). The FDIC did not request a postponement and there is no allegation that the arbitrator refused to consider evidence the FDIC submitted. Finally, the failure to hold an oral hearing cannot be deemed misbehavior that prejudiced the FDIC's rights because the FDIC has not shown that its evidence was not amenable to presentation in written form. Admittedly, a "paper hearing" often will be an inadequate means to determine the facts upon which an arbitration decision must rely. In this case, however, the nature of the decision to be made leads us to conclude that the "paper hearing" was adequate.[9] As the district court noted:

> [W]hat the parties bargained for was not a quasi-judicial proceeding conducted by lawyers, but [rather] the professional opinion of an independent accountant on an accounting issue—the value of a business. Accountants derive their calculations not from evidentiary hearings, but from working papers and discussions with other accountants. Thus, it was predictable that the instant arbitrator would base his decision on this information. Nothing in the parties' contractual sequential valuation process manifests an intent to require an oral evidentiary hearing. Had the parties intended the arbitration to resolve primarily legal issues through evidentiary hearings, they

9. The FDIC argues also that it had a due process right to an oral hearing. The arbitration involved here was private, not state, action; it was conducted pursuant to contract by a private arbitrator. Although Congress, in the exercise of its

commerce power, has provided for some governmental regulation of private arbitration agreements, we do not find in private arbitration proceedings the state action requisite for a constitutional due process claim.

surely would have agreed to use a lawyer, not an accountant, as the arbitrator, or declared arbitration rules as governing. Instead the parties instructed an accountant to resolve the dispute ..., leaving the procedure to the arbitrator's sound discretion.

*FDIC v. Air Florida*, No. 82–0525–N(I) at 8–9 (July 10, 1984) (unpublished order).

*Prejudgment Interest*

■ The district court granted Air Florida interest on the arbitration award from the date of the arbitrator's decision. California law provides that

> [e]very person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day.... ,

Cal.Civ.Code § 3287(a). The Agreement between the FDIC and Air Florida states that the arbitrator's determination would be final and binding on the parties. As the FDIC concedes, under the terms of the Agreement, Air Florida was entitled to interest from the date of the award. The FDIC contends, however, that a stipulation in the pretrial order changed this result. The stipulation reads:

> The parties have agreed that all issues with respect to the Cannery Adjustment will be determined by the Court, with the exception of the calculation of Net Cannery Cash Recovery and the resulting Cannery Adjustment under the Agreement. These calculations will be determined by ... an independent accountant pursuant to the procedures ... of the Agreement.... The parties further have agreed that the judgment in this proceeding will remain open until said calculations have been performed and the Court is able to enter a single final judgment.

The district court determined all issues relating to the cannery adjustment, with the exception of the adjustment calculation,

before the date of the arbitration decision.[10] Thus, the question is whether the agreement to keep the district court proceeding open until the court was "able to enter a single final judgment" meant that Air Florida's right to recover under the cannery adjustment did not *vest* until the entry of the final judgment. *See* Cal.Civ.Code § 3287(a). We think that the answer is no. Although Air Florida may have agreed to await receipt of the proceeds from the cannery adjustment until the entry of a final judgment, it did not stipulate away its contract right to recovery on the date of the arbitration decision. *Cf. French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 907 (9th Cir.1986) (holding that, under section 3287(a), right to recover arbitration award *vested* when plaintiff filed suit which resulted in the court compelling the disputed arbitration, and that damages are not made uncertain by the fact that liability is contested). The stipulation served to facilitate any set-offs that may have been required once the various claims and cross-claims in the litigation had been resolved, not to amend the original arbitration clause of the Agreement.

**CONCLUSION**

We hold that Air Florida's failure to make a tender offer breached its Agreement with the FDIC. We remand to the district court to determine whether the breach constituted a material failure of consideration. If the failure of consideration was material, the FDIC was entitled to rescind the Agreement. If the Agreement is rescinded, the FDIC's obligation under the cannery adjustment provision of the Agreement is discharged and the FDIC is entitled to a restitutionary remedy to adjust the equities between the parties.

If the Agreement was not rescinded, the cannery adjustment provision remains in effect, and Air Florida is entitled to the arbitration award, with interest from the date of the arbitrator's decision. This

---

**10.** The pretrial order stated that two issues of law relating to the cannery adjustment remained to be determined. The district court resolved both

issues in its Findings of Fact and Conclusions of Law of January 6, 1983, over a year before the arbitrator rendered his decision.

amount, however, must be set off against an award of damages to the FDIC as compensation for Air Florida's breach of its obligation to make a tender offer.

The judgment dismissing the claim of the FDIC is REVERSED. The judgment enforcing the arbitration award with prejudgment interest is VACATED. The judgment granting attorneys' fees is VACATED. The cause is REMANDED to the district for proceedings consistent with this opinion.

REVERSED in part, VACATED in part, and REMANDED.